ROBERTO CHÉVERE y VILMA COLÓN, ETC., demandantes y recurrentes, *v.* PEDRO CÁTALA RODRÍGUEZ y EVELYN QUILES, ETC., demandados y recurridos.

*Número:* R-83-332     *Resuelto:* 17 de mayo de 1984

434

*Ivette Berríos*, abogada de los recurrentes; *Héctor Santiago Rivera*, abogado del recurrido Manuel Félix Ramos.

El Juez Asociado Señor Negrón García emitió la opinión del Tribunal.

El concepto de responsabilidad, no es un concepto insular. No puede culminar ni agotarse dentro de sus presupuestos sino que se ramifica en el espacio y en el tiempo como consecuencia de la realidad que da vida al Derecho. Por ello, en forma subyacente, se vinculan a él la ley de adaptación al medio como sustrato y la autonomía de la voluntad como fundamento.

Considerada la responsabilidad en relación con el ambiente y con la posibilidad de elección, resulta un concepto dinámico que obra como estimulante en la vida profesional. Pero debe poseer límites. La falta de ella afecta al orden jurídico; pero su ilimitación produce una acción paralizante.

La adaptación al medio hace que esta figura jurídica adquiera distintas características de acuerdo con los ámbitos en los que se ejercita: se perfila atenta al signo de los tiempos. . . . A. C. Blasetti, *Responsabilidad del notario proveniente de sus deberes de asesoramiento y consejo*, 771 Rev. Notarial 339–340 (1967).

[L]a extensión de la responsabilidad civil del Notario viene determinada por la configuración que haga la norma de la función notarial. Lógicamente, a cada tipo histórico y positivo de notariado corresponderá una responsabilidad más o menos extensa del Notario. D. F. Gómez-Acebo, *La Responsabilidad Civil del Notario*, 5 Rev. Der. Not. 311, 319 (1954).

# I

*Hechos*

El notario Manuel Félix Ramos autorizó la escritura Núm. 9 sobre compraventa e hipoteca el 11 de abril de 1978. Los vendedores esposos Cátala-Quiles, a sabiendas, ocultaron a los compradores esposos Chévere-Colón la existencia de una segunda hipoteca que gravaba el inmueble desde octubre de 1974. "[S]i bien el señor Notario pudo haber hecho mención de la posibilidad de un estudio de título, *lo hizo prestándole importancia pasajera y mínima a las posibles consecuencias de no hacer este estudio posteriormente [y] descubrir un gravamen.*

Los esposos [vendedores] . . . conocían de la existencia del gravamen ya que ellos mismos suscribieron la obligación. *El notario no fue celoso en su deber como tal para con los compradores demandantes.*" (Énfasis nuestro.) Sentencia del Tribunal Superior, Sala de Bayamón.

Ante este trasfondo fáctico, en lo pertinente, la ilustrada sala sentenciadora expuso el siguiente razonamiento jurídico:

4. En cuanto al Notario demandado su responsabilidad estriba en su falta de diligencia al ejercer su función como tal. Un notario no está obligado a meramente *informar* a las partes de un negocio jurídico, sino que está obligado a cerciorarse, sin lugar a dudas, que las partes comprendan las consecuencias del acto que llevarán a cabo. En el caso *In Re Meléndez Pérez*, 104 D.P.R. 770 (1976), el Tribunal Supremo señala, *inter alia*, que "la fe pública notarial tiene como base la voluntad ilustrada de los contratantes. . . . El Notario, principal instrumento de la fe pública, tiene la indeclinable obligación de propiciar y cerciorarse de ese estado de *conciencia informada* supliendo las explicaciones, aclaraciones y advertencias. . . ." (Énfasis nuestro.)

5. Es de señalarse que por vía de la presente no se pretende hacer obligatorio un estudio de títulos para cada caso de otorgamiento de escritura, cosa que también señala el Honorable Irizarry Yunqué en su opinión del caso decidido por sentencia,

*In Re Lavastida, et al.*, 109 D.P.R. 45 (1979), a la pág. 79. Sin embargo, como el mismo juez indica que "un notario no puede cumplir a cabalidad su función pública, si autoriza escrituras en las que se mencionan y se constituyen gravámenes sin la certeza de que está en lo correcto en cuanto a su creación, existencia y rango." (p. 78). Ap. I, págs. 5-6.

Sin embargo, no impuso responsabilidad solidaria al notario. *Erró.*

## II

*Visión judicial moderna del notariado*

Hace varios años este Tribunal, con énfasis renovado invistió el ejercicio notarial con una nueva visión.[1] El descargo de esa misión trasciende la pasividad. Así, en *In re Vélez*, 103 D.P.R. 590, 597-598 (1975) para contribuir a su enaltecimiento público "fijamos otro rumbo o derrotero y rechazamos y condenamos enérgicamente en nuestra sociedad la participación consciente" de un notario en una escritura simulada. Subsiguientemente, en *In re Meléndez Pérez*, 104 D.P.R. 770, 775-776 (1976) expusimos:

El consejo del abogado notario debe guiar la redacción del documento público y dar luz en el acto final del otorgamiento.

La función del notario trasciende el acto externo de legalización de unas firmas. Presupone la creación de un nivel de entendimiento y comunicación entre el fedante y los otorgantes que le permita a éstos formar una racional conciencia del acto en que concurren. *La fe pública notarial tiene como base la voluntad ilustrada de los contratantes; no puede ser*

---

[1] Los criterios generales que imponen sobre el notario "un grado de responsabilidad muy considerable", se explica "ya que cada notario asume personalmente todas las atribuciones inherentes a la potestad notarial, y el acto notarial es completo con la sola intervención del notario, sin que ninguna otra autoridad pueda revisarlo ni modificarlo. Si más que ninguna otra función, tiene la notarial un carácter personalísimo, puesto que el público acude al notario por la confianza que la persona le inspira, se comprende que la ley ha de ser rigurosa en exigir responsabilidad al que, burlando tal confianza o abusando de ella, falta a la noble misión que le incumbe". J. M. Sanahuja y Soler, *Tratado de Derecho Notarial*, Barcelona, Ed. Bosch, 1945, T. I, págs. 340-341.

*fruto de la ignorancia y la obscuridad.* El notario, principal instrumento de la fe pública, tiene la indeclinable obligación de propiciar *y cerciorarse de ese estado de conciencia informada supliendo las explicaciones, aclaraciones y advertencias en todo caso en que hagan falta para lograr el consentimiento enterado de los otorgantes al acto notarial.* (Énfasis nuestro y sumarios omitidos.)

Este enfoque[2] complementaba los pronunciamentos en *Empire Life Ins. Co.* v. *Registrador,* 105 D.P.R. 136, 139 (1976) de que la "notaría es faena de tiempo y paciente integración de todos los elementos documentales, *que sufre su calidad con la festinación y la atracción de los atrechos fáciles".*

█ La responsabilidad civil notarial, según expresión de Ávila Álvarez, "puede desatarse cuando el notario causa un daño a sus clientes: 1. [p]or los defectos formales del instrumento que determinan la frustración del fin perseguido con la intervención notarial[;] 2. *[p]or los vicios de fondo que determinen la nulidad absoluta* (pues si los hay, el Notario debe abstenerse de intervenir) *o la relativa (a menos que ésta se produzca por vicio previsto por el Notario y advertido a los otorgantes)*[;] 3. [p]or la desacertada elección del medio jurídico para la consecución del fin propuesto[;] 4. *[p]or el deficiente asesoramiento en cuanto a las consecuencias del acto notariado* (impuestos, retractos, etc.)[;y] 5. [p]or la incorrecta conducta del Notario como depositario o mandatario de sus clientes (pago de impuestos, presentación de documentos, etc.)". (Énfasis nuestro.) P. Ávila Álvarez, *Estudios de Derecho Notarial,* 4ta ed., Madrid, Ed. Montecorvo, 1973, págs. 402–403.

Gómez-Acebo analiza esta responsabilidad y elabora un esquema por inobservancia de los deberes profesionales rela-

---

[2] "El notario no es, como en el amanecer de la Institución, un simple redactor del acto o contrato, sino que es una fuerza inteligente, emanación de la soberanía, que al comunicar la autenticidad a los instrumentos *ha de garantizar, además de la certeza de lo que en ellos conste, su valor jurídico. . . ."* (Énfasis nuestro.) Sanahuja y Soler, *op. cit.,* pág. 341.

tivos al: (1) juicio de idoneidad del propio Notario (competencia, ausencia de prohibición legal); (2) juicio de licitud del acto; (3) juicio de capacidad; (4) juicio de legitimación de los otorgantes; (5) juicio sobre el esquema jurídico más apto para la consecución del resultado querido por los otorgantes; (6) cumplimiento de los requisitos de redacción y forma; (7) *cumplimiento de los deberes de información.* Gómez-Acebo, *op. cit.*, págs. 321-323.

█ En cuanto al deber de información, también llamado "deber de consejo", tanto en la práctica española como en la puertorriqueña "forma parte del mismo instrumento público: entre el otorgamiento y la autorización, el Notario debe dar fe de haber hecho las reservas y advertencias legales y se deja a la iniciativa del Notario, *según su mayor o menor importancia, y a los efectos de salvar su responsabilidad, su constancia* expresa en la escritura". (Énfasis nuestro.) Íd., pág. 323.

█ "El notario, al autorizar una escritura pública, tiene —se dice— cuatro deberes principales: 1. [i]ndagar la voluntad de los otorgantes[;] 2. [f]ormular la voluntad indagada[;] 3. [i]nvestigar ciertos hechos y datos de los que depende la eficacia o validez del negocio[;] 4. [d]arles a los otorgantes las informaciones, aclaraciones y advertencias necesarias para que comprendan el sentido, así como los efectos y consecuencias, del negocio, y se den cuenta de los riesgos que corren en celebrarlo." (Énfasis nuestro.) D. Winfried Kralik, *El deber de informar del notario*, 22 Anales de la Academia Matritense del Notariado, Vol. II, pág. 11 (1982). Sobre el contenido del deber, este mismo autor consigna: que no nace de una obligación del notario con su cliente por medio de un contrato jurídico, ni de la deontología, sino como *deber oficial* "en el interés de terceros, y por eso no está sometido ni a la disposición del notario ni a la de los otorgantes".(3) Íd., pág. 15.

_____

(3) Entre los extremos integrantes del deber de información, Winfried Kralik sostiene que conlleva "cerciorarse de que los otorgantes hayan comprendido el sen-

## III

*Naturaleza jurídica de la responsabilidad civil*

Una de las cuestiones más examinadas entre los estudiosos de la materia resulta ser la naturaleza jurídica de la responsabilidad civil del notario: ¿contractual o aquiliana?

La doctrina clásica distingue la culpa contractual de la extracontractual. Los autores modernos afirman que no existen dos culpas de distinta naturaleza, sino dos sistemas de responsabilidad distintos, es decir que sólo hay diferencias técnicas entre la responsabilidad contractual y la responsabilidad delicitual. M. F. Bizzotto de Coloma, *Responsabilidad del Notario*, 754 Rev. Notarial 513, 518 (1964).

Por su parte, "[e]n su libro, CHIRONI, desde el punto de vista estrictamente jurídico, refuta la división de la culpa en delictual y contractual, expresando que 'la culpa es una'". Blasetti, *op. cit.*, pág. 346.

Tratando de hacer una megasíntesis con respecto a las principales líneas doctrinales, podríamos decir que hay dos grandes grupos que discrepan en cuanto a la naturaleza jurídica de la responsabilidad notarial. En un primer grupo podría citarse a José A. Negri, Henoch Aguiar, Enrique Díaz de Guijarro, Raymundo M. Salvat y a José María Mustápich para quienes la naturaleza de la relación jurídica entre el escribano y el cliente es de carácter extracontractual, porque aun en el caso de que violara una norma contractual que li-

---

tido y contenido del negocio mismo" (pág. 16); "informar . . . los requisitos necesarios para [su] validez" (pág. 17); "abarca también las consecuencias jurídicas del negocio, aun cuando no resulten del texto mismo del documento. Los otorgantes deben conocer la ejecutoriedad de la escritura pública y los efectos prácticos de esa ejecutoriedad" (pág. 19); en regla general, "el notario no tiene el deber de informar a los interesados sobre las consecuencias económicas del negocio jurídico" (pág. 23); el deber de información "no debe degenerar en un formalismo a cargo del notario" (pág. 26); ese deber subsiste aun "cuando las partes hayan concluido el negocio antes de acudir [ante] él (pág. 27); al "informar a los interesados, tiene que observar la más estricta imparcialidad" (pág. 28); y "hay que distinguir las personas a quienes el notario debe dar sus informes y advertencias, y las personas que pueden hacer valer su responsabilidad por los daños causados por la omisión de la debida información" (pág. 29). D. Winfried Kralik, *El deber de informar del notario*, 22 Anales de la Academia Matritense del Notariado, Vol. II, pág. 11 y ss. (1982).

gara al notario con el cliente, al mismo tiempo también se estaría violando una norma superior del Estado. Desde ese punto de vista el escribano es considerado como un profesional con actividad reglamentada por el Estado y a pesar de que es un profesional, su responsabilidad es extracontractual.

Un segundo grupo, que podríamos llamar ecléctico, está integrado por Leonardo Colombo y Alberto Spota. Cuando no hay contrato porque el escribano actúa como funcionario público, la responsabilidad es extracontractual y cuando hay contrato el hecho violatorio del mismo sería contractual.

Sintetizando, diremos que la labor del escribano es una actividad profesional con función pública delegada. Luego, existen dos relaciones: una con el cliente y otra con el Estado. Y, consecuentemente, dos órdenes de responsabilidad. . . . Íd., págs. 347-348.

Giménez-Arnau, nos ilustra:

Tradicionalmente, en España al menos, se situó la responsabilidad civil del Notario en el terreno de la culpa extracontractual. Pero modernamente, la cuestión es muy debatida.

El problema no es solamente de orden teórico dice GONZÁLEZ PALOMINO, ya que puede tener influjo nada menos que en la medida de la responsabilidad y en la fijación de las normas que la regulen. Si se tratara de responsabilidad contractual las normas serían las de los arts. 1.101 al 1.107 del Código civil. Si se tratara de responsabilidad extracontractual, serían las del art. 1.902 y siguientes del Código civil. En esta rige, y no en la otra, la responsabilidad por culpa levísima.

La diferencia entre considerar que la responsabilidad deriva de la aquilina (extracontractual) o de una relación contractual tiene grandes consecuencias en el orden práctico; en materia de carga de la prueba (del perjudicado en la contractual); en cuanto al grado de responsabilidad (levísima en la aquilina, leve en la contractual); en lo que se refiere al alcance de la reparación (los daños causados en la aquilina y los que se deriven del incumplimiento en la contractual): y en fin —aspecto muy importante— en lo que atañe a la prescripción de la acción (un año o quince años). (Escolio omitido.) E. Giménez-Arnau, *Derecho Notarial*, Pamplona, Ed. Univ. Navarra, 1976, pág. 336.

Continúa indicando que entre estas dos posiciones se promueve una tercera, la que "da a la responsabilidad del

Notario un carácter legal, equiparándola a la del funcionario. Así dice ESCOBAR que la relación entre Notario y cliente no puede calificarse ni de contractual ni de extracontractual: la fuente de la responsabilidad está en el derecho público 'correspondiendo a la naturaleza pública de la función que desempeña'. Pero reconoce, de acuerdo con OTTO MAYER, que la obligación de reparar el perjuicio, es de naturaleza civil". (Escolio omitido.) Íd., pág. 336.

Este autor identifica esta tesis, la de Gómez-Acebo y González Palomino como contractualistas, que a su juicio "busca[n] una fórmula que prive a la relación contractual de sus consecuencias normales". Íd., pág. 337. Sin embargo, destaca cómo otras admiten la existencia del criterio, pero ubican la responsabilidad fuera de ese terreno. (Rodríguez Adrados.) Más aún, Jerónimo López enfoca el problema a base de distinguir dos tipos de actuación notarial; a saber, cuando el notario "se limita a prestar sus funciones con sujeción a los deberes a los que está sometido como funcionario público" —en cuyo caso "no existe contrato alguno" y en ausencia de negativa justificada, tiene que prestar el servicio— y cuando "presta su ministerio en el seno de una relación jurídica convenida con el o con los requirentes, o bien actúa no en la esfera en la cual *debe actuar*, sino en la que *puede* actuar como tal Notario". Giménez-Arnau, *op. cit.*, pág. 338.

Si en la primera situación "presta inadecuadamente un servicio" y causa daño, viene obligado a repararlo a tenor con el Art. 1.902 del Código Civil español. En el segundo de los casos la responsabilidad será contractual.

A base de este análisis Giménez-Arnau, *op. cit.*, pág. 339, termina exponiendo las siguientes conclusiones merecedoras de nuestro endoso:

[N]os parecen aceptables . . . la responsabilidad civil del Notario puede ser de naturaleza contractual o extracontractual. El mero dato de haber obtenido del Notario la prestación de sus funciones no permite presumir el carácter contractual de la

responsabilidad; por el contrario, *es preciso adoptar como criterio general la responsabilidad de origen extracontractual siempre que la labor del Notario se haya limitado a la esfera de sus deberes como funcionario*; quien pretenda que la responsabilidad es de otra naturaleza tiene la carga de probar la existencia de un contrato de tipo determinado. (Énfasis nuestro.)

Dependiendo de la valoración que se haga de los hechos se extiende la responsabilidad. En la extracontractual no pueden aplicarse los Arts. 1055, 1056 y 1060 del Código Civil, 31 L.P.R.A. secs. 3019, 3020 y 3024. La acción prescribe al año. Y cuando se le atribuye carácter contractual, "si hay buena fe por parte del Notario responderá éste de todos los daños *previstos* o que se hayan podido prever *al tiempo* de constituirse la obligación y que sean *consecuencia necesaria* de su falta de cumplimiento . . . [Art. 1060], aunque si 'la responsabilidad procede de negligencia, la indemnización podrá moderarse por los Tribunales, según los casos . . . [Art. 1056]. Si se actúa con dolo alcanza la reparación a todos los daños y en perjuicios que conocidamente se deriven de la falta de cumplimiento . . . [párrafo 2 del Art. 1060]'". Giménez-Arnau, *op. cit.*, pág. 341.

## IV

*Obligación, determinación y constancia de cargas*

La buena práctica notarial exige el examen de los antecedentes en la redacción del instrumento público.

Si el instrumento se redactase a base de las declaraciones de las partes simplemente no podría sentarse la presunción de legalidad y validez del negocio (por la probalidad de que hubiese no sólo mala fe sino, también, impericia técnica en la exposición de los antecedentes por los interesados), ni la escritura quedaría completa, pues requeriría ir acompañada constantemente de la prueba documental que debió presentarse al Notario. Es preciso que la escritura descanse en la calificación del Notario (sobre los presupuestos del negocio), que descarte la probabilidad de mala fe, por la responsabi-

lidad notarial, y de impericia, por la preparación técnica de dicho funcionario.

De aquí el derecho de éste (reconocido por el Reglamento Notarial en varios preceptos) de examinar los documentos necesarios para su calificación, y de aquí que sólo en casos excepcionales deba dispensar de la presentación de los mismos. (Escolios omitidos.) Ávila Álvarez, *op. cit.*, pág. 109.

En *In re Meléndez Pérez*, supra, pág. 775 declaramos:

En su deber de ilustrar, y dar consejo legal a las partes contratantes, no hay guardarraya que separe al notario del abogado. El notario que impasible ve consumarse en su presencia un pacto cuyas consecuencias legales ignora alguna de las partes o que pudiendo hacerlo, por ser abogado, rehúsa explicar a los menos informados del significado y proyecciones de cláusulas para ellos poco menos que ininteligibles; el notario que limita su intervención rutinaria a leer o dar a leer el documento a los otorgantes y asegurarse de la identidad de sus personas y firmas, en un ritual aséptico pero vacío de la inteligencia y comprensión de los firmantes, está con su desidia derrotando los fines y propósitos que le hicieron depositario de inapreciable confianza pública.

█ Esa investigación de los antecedentes, al igual que la determinación de cargas y gravámenes a hacerse en la escritura, resultan de incuestionable trascendencia, [4] para

---

[4] La práctica no es nueva. Ya desde el 1895, Fernández Casado en su citada obra exponía: "Acontece, respecto de algunas circunstancias que ni constan en los títulos, ni las partes pueden ó quieren expresarlas; y en este caso hay que distinguir si aquellas circunstancias son irritantes del acto ó contrato ó no lo son; *en·el primer caso, debe el Notario negarse á redactar y autorizar el instrumento*; en el segundo, advertirá á las partes la conveniencia de expresarlas; y si no quisieren ó no pudieren hacerlo, *salvará la propia responsabilidad acreditándolo en el mismo instrumento público.*" (Énfasis nuestro.) M. Fernández Casado, *Tratado de Notaría*, Madrid, Ed. Vda. M. Minuesa de los Ríos, 1895, T. I, pág. 553.

Resulta cuestionable, como hipótesis absoluta, que hechas y consignadas tales advertencias en el documento, puede el notario autenticar el documento sin ulterior responsabilidad. Una buena práctica notarial rechaza esa postura. Al instrumentar un auto anulable en función a "la advertencia del vicio o de la ineficacia relativa a los otorgantes —es, a mi entender— una razón inviable legalmente, ya que no existe, en absoluto, ningún texto legal, ni reglamentario, que permita al Notario autorizar, *en general*, con 'advertencias' ...". J. A. Molleda Fernández-Llamazares, *Deber de servicio y juicio notarial de legalidad*, 21 Anales de la Academia Matritense del Notariado 451, 496 (1978).

"efectos civiles (por ejemplo, saneamiento por gravámenes de la finca vendida 'sin mencionarlo la escritura')"; para "efectos registrales, para la confrontación con las que figuren en el Registro, si bien la falta de expresión de cargas en las escrituras no es defecto que impida la inscripción del título"; y a "efectos notariales, porque la determinación de las cargas es necesaria para la posterior concreción en la parte dispositiva de las responsabilidades que contrae cada parte contratante"; a "efectos fiscales . . .". (Escolios omitidos.) Ávila Álvarez, *op. cit.*, pág. 183.

¿De qué forma acepta la doctrina esa constancia?

Se admiten dos formas:

*a)* Determinación individual. Se hace (en la parte expositiva de la escritura, después de la descripción y reseña del título de adquisición de la finca) indicándose la clase de carga, titular; plazo (si es temporal), contenido (capital y pensión en los censos; capital, intereses y cantidad señalada para costas en las hipotecas, etc.) y fecha y título de constitución.

*b)* Determinación "genérica" o por remisión del Notario y otorgantes (con la conformidad de éstos) "a lo que resulte de los libros del Registro o Registros de la Propiedad". Íd., págs. 185–186.

■ Y sobre las fuentes de información del notario,

Las cargas se harán constar:

—"en primer término por lo que resulte de la declaración de la parte trasmitente o de la que constituya un gravamen, y

—en segundo lugar, por lo que aparezca de los títulos o documentos que al Notario se exhiban".

Si ambas fuentes de información coinciden, no habrá problema: se hará constar que, según manifiesta el otorgante y resulta del título presentado, la finca se halla afecta a las cargas que sean.

Pero puede suceder que en los documentos exhibidos (título de adquisición, certificado del Registro, etc.) no aparezcan cargas que existan en la realidad (por ejemplo, por ser posteriores a la fecha de dichos documentos); en este caso habrá que hacer constar que, aunque de los títulos presentados no aparencen cargas, la finca se halla afecta a las que manifieste el otorgante.

Y a la inversa: puede suceder que en los títulos o certificaciones del Registro aparezcan cargas aparentes, es decir, que no existen ya en la realidad. Y ante esta otra posibilidad de discordancia entre ambas fuentes de información del Notario, cabe:

—Prescindir de ambas y hacer la determinación genérica de cargas.

—Utilizar las dos designando individualmente las cargas según el título o certificado y haciendo constar su inexistencia (prescripción, cancelación no inscrita, etc.), según manifestación de los interesados.

—Atender exclusivamente a la manifestación de inexistencia de cargas que hagan los interesados y en especial el adquirente después de conocer el Registro y los títulos. Íd., págs. 186-187.

■■■ Y finalmente, sobre la advertencia, "El Notario en todo caso 'advertirá al adquirente de la conveniencia de que se acredite el estado de cargas con la certificación del Registro de la Propiedad, o lo compruebe directamente examinando los libros del mismo'. Y quizá convenga advertir también que la expedición de la certificación no cierra el Registro y que, por tanto, no obstante la certificación negativa que se presente, pueden existir cargas inscritas con posterioridad . . . por muy reciente que sea dicha certificación." Íd., pág. 187.

## V

*Conclusiones*

■■■ Al aplicar al caso de autos estos enfoques doctrinarios de vanguardia en esta materia aflora prístinamente la conclusión de que la responsabilidad civil del notario Manuel Félix Ramos es de origen extracontractual y solidaria.

La causa de acción de los esposos Chévere-Colón no sólo está predicada en el engaño de los vendedores Cátala-Quiles, sino en la negligencia del notario Félix Ramos al incumplir con su deber legal de una adecuada ilustración e información al prestarle "importancia pasajera y mínima a las

posibles consecuencias de no hacer este estudio posteriormente y descubrir un gravamen". Ap. I, págs. 6–7. Ambas conductas de los protagonistas —una de acción y la otra de omisión— se combinan para causar el daño. El vínculo *in solidum* es evidente. Véanse *Rivera* v. *Great Am. Indemnity Co.*, 70 D.P.R. 825, 828 (1950); *García* v. *Gobierno de la Capital*, 72 D.P.R. 138, 146 (1951). "En la práctica notarial con rareza se dan las circunstancias de urgencia e imprevisión que a veces frustran la abogacía por lo que son contadas las ocasiones en que un notario pueda acogerse al palio de olvido, inadvertencia o negligencia excusable." *In re Meléndez Pérez*, supra, pág. 775.

El "notario que falla a la sociedad y a los que ante él comparecen en este fundamental aspecto de *aclaración e ilustración* será *el coautor* de un consentimiento enfermo e ineficaz en derecho y habrá traicionado la fe de la que es principal guardador". (Énfasis nuestro.) *In re Meléndez Pérez*, supra, págs. 776–777.

*Se expedirá el auto y modificará la sentencia del Tribunal Superior, Sala de Bayamón, fechada 6 de junio de 1983, a los efectos de condenar solidariamente a todos los demandados a satisfacerla. Así modificada, será confirmada.*

Los Jueces Asociados Señores Torres Rigual y Rebollo López concurren en el resultado sin opinión.