ESTEBAN ROSAS GONZÁLEZ y OTRA, demandantes y recurrentes, *v.* NELSON ACOSTA PAGÁN y OTROS, demandados y recurridos.

*Número:* RE-89-140        *Resuelto:* 3 de diciembre de 1993

*Federico Lora López*, abogado de los recurrentes; *Edwin Toro Goyco*, abogado del recurrido licenciado Martínez Ramírez.

La Juez Asociada Señora Naveira de Rodón emitió la opinión del Tribunal.

*Hechos*

Los esposos Esteban Rosas González y Eligia Rodríguez Lebrón vendieron al matrimonio compuesto por Nelson Acosta Pagán y Alma Figueroa Mercado una finca ubicada en el barrio Jaguitas de Hormigueros. Dicha finca tenía, al momento de la venta, una cabida superficial de poco más de ocho cuerdas (8.2371). El precio de venta acordado fue la suma de cuarenta y siete mil dólares ($47,000), pagaderos en cinco (5) años al ocho porciento (8%) de interés. El 15 de septiembre de 1973 las partes otorgaron la Escritura Núm. 279 de Segregación, Venta e Hipoteca ante el aboga-

do-notario Jovino Martínez Ramírez.(¹) Mediante esta Escritura se constituyó Hipoteca Voluntaria, con el rango de Primera, a favor de los vendedores.(²) El abogado-notario Martínez Ramírez se comprometió a inscribir la escritura en el Registro de la Propiedad.(³)

El mismo día en que se otorgó la Escritura Núm. 279, los vendedores, esposos Rosas González y Rodríguez Lebrón, le prestaron a los compradores Acosta Pagán y Figueroa Mercado la suma de veinticinco mil dólares ($25,000). Por tal razón, los compradores suscribieron ante el abogado-notario Martínez Ramírez un pagaré a favor de los esposos Rosas González y Lebrón Rodríguez por la cantidad antes mencionada más intereses al ocho porciento (8%) anual. La fecha de vencimiento del pagaré era el 15 de septiembre de 1975. En el susodicho pagaré se incluyó una cláusula que establecía que la deuda sería satisfecha mediante el pago de dos mil quinientos dólares ($2,500) por cada solar que se segregara y vendiera de la finca adquirida por los compradores.

El 19 de septiembre de 1973 fue presentada la Escritura Núm. 279 al Registro de la Propiedad para inscripción por el Sr. Pedro Osorio. A éste le fue encomendada dicha tarea por el abogado-notario Martínez Ramírez. En la fecha antes mencionada quedó inscrita la compraventa, pero no así la hipoteca.(⁴) Ni las partes, ni el abogado-notario Martínez

---

(¹) El Lcdo. Jovino Martínez Ramírez había ofrecido sus servicios como notario en ocasiones anteriores a los esposos Esteban Rosas González y Eligia Rodríguez Lebrón.

(²) La Escritura Núm. 279 de Segregación, Venta e Hipoteca incluía una cláusula a los efectos de que los acreedores hipotecarios se obligaban a firmar cualquier documento de liberación parcial de la finca para la segregación y venta de solares de ésta, previo el pago de una suma de dinero, la cual se determinaría por las partes al momento de hacerse la liberación.

(³) Así consta en las determinaciones de hecho del tribunal de instancia. Además, tal hecho fue aceptado por el abogado-notario Martínez Ramírez en la moción solicitando reconsideración a la sentencia emitida por el tribunal de instancia, el 20 de enero de 1989, y en el alegato sometido ante este Tribunal.

(⁴) En las determinaciones de hecho del tribunal de instancia se hace constar que "[p]or razones desconocidas, no se inscribió la hipoteca, expresándose en este sentido en la certificación registral expedida el 25 de septiembre de 1985 que de

Ramírez se percataron de inmediato de que la hipoteca por la suma de cuarenta y siete mil dólares ($47,000) no quedó constituida.

Posteriormente, los vendedores, esposos Rosas González y Rodríguez Lebrón, le prestaron adicionalmente a los compradores Acosta Pagán y Figueroa Mercado la suma de diez mil dólares ($10,000). Por tal razón, el 21 de febrero de 1974, los compradores suscribieron ante el abogado-notario Martínez Ramírez un pagaré al portador por la suma antes mencionada. Se constituyó una segunda hipoteca para garantizar el nuevo préstamo sobre la finca de poco más de ocho (8) cuerdas. La Escritura Núm. 68, que se otorgó por las partes para constituir Hipoteca en Garantía de Pagaré Hipotecario, hacía referencia al gravamen hipotecario por la suma de cuarenta y siete mil dólares ($47,000) que afectaba la finca en virtud de la compraventa de 15 de septiembre de 1973. Esta segunda hipoteca sí quedó debidamente inscrita en el Registro de la Propiedad, pero a todos los efectos con rango de primera. Para entonces, ni las partes ni el abogado-notario Martínez Ramírez se habían percatado de que la primera hipoteca no se había constituido.

Así las cosas, a partir de mayo de 1974 las partes comparecieron ante el abogado-notario Martínez Ramírez para el otorgamiento de trece (13) escrituras de segregación, venta y liberación de solares de la finca original. Cabe señalar que, entre estas escrituras, las números 161, 195, 196 y 231 liberaban once (11) solares. En las mismas se expresaba que los vendedores recibían dos mil dólares ($2,000) por cada solar para abonar mil dólares ($1,000) a cada hipoteca, la primera hipoteca constituida en virtud de la Escritura Núm. 279 y la hipoteca con rango de segunda constituida en virtud de la Escritura Núm. 68. De manera que, al liberarse los primeros diez (10) solares, se satisfizo

dicha hipoteca 'no se solicita inscripción'. En el Registro permaneció únicamente la mención de la misma". (Escolio omitido.)

la deuda de diez mil dólares ($10,000) garantizada por la segunda hipoteca. Ésta era la única que quedó debidamente inscrita, por lo que la propiedad en cuestión quedó libre de gravámenes.([5])

En mayo de 1976 se otorgó la última escritura de segregación, compraventa y liberación. En dicha escritura el abogado-notario Martínez Ramírez requirió la comparecencia de testigos instrumentales al supuestamente percatarse, por primera vez, del hecho de que el señor Rosas González estaba ciego.([6]) Este requerimiento aparentemente incomodó a los esposos Rosas González y Rodríguez Lebrón, quienes entonces optaron por utilizar los servicios de otro notario para negocios posteriores.

En un momento dado, los compradores-deudores se atrasaron en el pago de la deuda con los vendedores-acreedores. Esto propició una serie de negociaciones que culminaron en un reconocimiento de deuda por la suma de cincuenta y ocho mil novecientos treinta y un dólares con cincuenta y ocho centavos ($58,931.58) en enero de 1977. Debido a que el incumplimiento persistió, los esposos Rosas González y Rodríguez Lebrón presentaron demanda en

---

([5]) En las determinaciones de hecho del tribunal de instancia se dice que:

"En el otorgamiento de dichas escrituras el Lcdo. Jovino Martínez actuó en su capacidad de notario público, cobrando los honorarios que estipula la ley, los cuales fueron satisfechos por los codemandados Nelson Acosta Pagán y Alma Figueroa Mercado. Si bien durante este período, el Lcdo. Martínez brindó asesoramiento de carácter financiero a los demandantes en su capacidad de contable; y prestó servicios de índole personal, tal y como la custodia de un arma de fuego durante una disputa matrimonial entre los codemandantes, no surge que el codemandado hubiera actuado en otra capacidad que la de notario con respecto a los negocios jurídicos mencionados.

"Durante este período, sin embargo, el Lcdo. Martínez sí actuaba como abogado de los codemandados Nelson Acosta Pagán y Alma Figueroa Mercado con relación a varias gestiones de cobro de dinero. Adicionalmente, el Lcdo. Martínez efectuaba abonos a la deuda con los codemandantes en representación y por instrucciones de dichos codemandados. En virtud de dichos pagos, llegaron a saldarse los préstamos por $10,000.00 y $25,000.00, quedando pendiente el balance de la deuda original de $47,000.00 más sus intereses."

([6]) El abogado-notario Martínez Ramírez testificó que, hasta ese momento, no se había dado cuenta de que el señor Rosas González estaba ciego, a pesar de que compareció a casa de éste cada vez que se otorgaba una de las escrituras.

cobro de dinero y ejecución de hipoteca ante el Tribunal Superior, Sala de Mayagüez, el 15 de enero de 1979.

El pleito estuvo paralizado por algún tiempo debido a que los demandados habían acudido al Tribunal de Quiebras el 3 de mayo de 1979.([7]) Como parte de la solicitud presentada ante el Tribunal de Quiebras, los esposos Acosta Pagán y Figueroa Mercado informaron que los señores Rosas González y Rodríguez Lebrón eran acreedores asegurados por la cantidad de cuarenta y siete mil dólares ($47,000). Esto, obviamente, bajo la creencia equivocada de que la hipoteca constituida mediante la Escritura Núm. 279 había sido inscrita en el Registro de la Propiedad.

A tales efectos, se sometió el plan de reorganización ante el Tribunal de Quiebras. Éste fue aprobado por el Tribunal el 22 de febrero de 1980, por lo que el caso fue cerrado el 24 de marzo de 1980.([8])

Cuatro (4) años más tarde, los demandantes contrataron nueva representación legal. A base de las gestiones realizadas por sus nuevos abogados es que se enteran los demandantes de que la hipoteca constituida por la Escritura Núm. 279 no había sido inscrita. Esto le fue informado al abogado-notario Martínez Ramírez. Ante tal situación, los demandantes presentaron una moción el 24 de noviembre de 1984 en el Tribunal de Quiebras solicitando la reapertura del caso bajo la teoría de que se cometió fraude por parte de los compradores-deudores al indicar que los venderos-acreedores tenían una acreencia asegurada durante el proceso de reorganización. Insistieron en que si se hubiese revelado el valor real de la propiedad, esto hubiera demostrado que la deuda no era asegurada. Esta solicitud de reapertura fue denegada por el Tribunal de Quiebras el 6 de diciembre de 1984. Tal decisión fue

---

([7]) En ese entonces presentaron una solicitud bajo el Capítulo 11 del Código de Quiebras.

([8]) Según los compradores-deudores, como los vendedores no eran realmente acreedores asegurados debido a que la hipoteca *no se inscribió*, la *decisión* del Tribunal de Quiebras tuvo el efecto de exonerarlos de la deuda.

confirmada por el Tribunal de Distrito federal el 1ro de abril de 1986. Concluyó el foro federal que hubo incuria por parte de los demandantes.[9]

Así las cosas, el 3 de junio de 1985 los demandantes presentaron una moción ante el Tribunal Superior, Sala de Mayagüez, para que se continuaran los procedimientos. Arguyeron que habiéndose cerrado el caso en el Tribunal de Quiebras, el acreedor podía continuar cualquier acción que tuviera disponible. Además, solicitaron permiso para enmendar la demanda y traer como demandado al abogado-notario Martínez Ramírez por haber incumplido sus funciones como notario con relación a los hechos de este caso. El 10 de septiembre de 1985 el Tribunal Superior, Sala de Mayagüez, declaró con lugar la solicitud de los demandantes.[10]

Básicamente en la demanda enmendada se alegaba que la hipoteca para garantizar la venta de la propiedad, por la cantidad de cuarenta y siete mil dólares ($47,000), no fue inscrita en el Registro de la Propiedad debido a la negligencia del abogado-notario Martínez Ramírez. Además, se alegó que dicha hipoteca quedó finalmente inscrita en 1985, mediante gestiones del abogado-notario Martínez

---

[9] El Juez del Tribunal de Distrito federal expresó lo siguiente:

"We cannot overlook the fact that as early as June 14, 1974 appellants were aware of the bankruptcy proceedings from the motion to stay filed by the debtors in the state court. Also, the December 1, 1980 letter from debtor's attorney informed the appellants that the discharge order had already been entered. This letter alone should have indicated to appellants there was need for haste. Despite this, appellants waited until November 26, 1984, a period of almost four years, before requesting the reopening of the bankruptcy proceedings.

"We note that equity assists the vigilant and diligent, not those who sleep on their rights. Appellants' actions after receiving notice of the bankruptcy constitute dilatory behavior under the circumstances. Given the size of appellants' claim, the length of time which has transpired since the original filing of the bankruptcy proceedings and the closing of the case in that forum, together with their knowledge that debtors were in the process of reorganization, appellants' efforts were clearly insufficient. We find that having delayed so long, their claim is barred by laches." (Citas omitidas).

[10] Cabe señalar que anteriormente se había denegado una moción de desestimación presentada por los demandados, pues no se incluyó la documentación referente al plan de reorganización sometido ante el Tribunal de Quiebras ni la disposición del caso por dicho foro.

Ramírez, habiendo transcurrido doce (12) años desde el otorgamiento de la escritura.

Por su parte, el abogado-notario Martínez Ramírez contestó la demanda negando las imputaciones e instó reconvención. Al poco tiempo solicitó permiso para renunciar a la representación legal de los codemandados, esposos Acosta Pagán y Figueroa Mercado pues, según lo alegado por los demandantes, se planteaba un posible conflicto de intereses con sus representados. Sostuvo, además, que los codemandados habían abandonado la jurisdicción por lo que él ya no tenía comunicación con ellos.[11]

Posteriormente, el codemandado Martínez Ramírez presentó una segunda moción de desestimación y/o paralización de procedimiento por descargo de deuda, alegando que la deuda de los codemandados había sido exonerada por el Tribunal de Quiebras. Planteó, a su vez, que la reclamación en su contra estaba prescrita. El Tribunal Superior declaró sin lugar la moción.

Finalmente se celebró la vista evidenciaria y, luego de desfilada la prueba, se le concedió a las partes la oportunidad de presentar memorandos de derecho.[12] El asunto quedó entonces ante la consideración del Tribunal.

El 20 de enero de 1989 el Tribunal Superior, Sala de Mayagüez, dictó sentencia en la que declaró con lugar la demanda contra los codemandados Acosta Pagán y Figueroa Mercado. Los obligó a satisfacer a los demandantes la suma de cincuenta y ocho mil novecientos treinta y un dólares con cincuenta y ocho centavos ($58,931.58), más intereses al doce por ciento (12%) anual desde la radicación de la demanda. Asimismo, les impuso la cantidad de quince

---

[11] El 19 de marzo de 1987 el Tribunal Superior, Sala de Mayagüez, relevó al abogado-notario Martínez Ramírez de la representación legal de los codemandados, esposos Acosta Pagán y Figueroa Mercado. Como éstos no pudieron ser localizados, se les notificó la demanda enmendada y la renuncia de su representación legal mediante edicto.

[12] No comparecieron a los procedimientos los codemandados, esposos Acosta Pagán y Figueroa Mercado.

mil dólares ($15,000) para costas, gastos y honorarios de abogado. No obstante, declaró sin lugar la reclamación contra el abogado-notario Martínez Ramírez, así como la reconvención instada por éste. Ordenó, a su vez, que se vendiera en pública subasta la propiedad que dio base al presente litigio.

Inconforme con esta determinación del tribunal de instancia, los demandantes presentaron recurso de revisión antes nos planteando la comisión de cuatro (4) errores:[13]

A.   Erró el Honorable Tribunal de Instancia al resolver que las violaciones incurridas por el Lcdo. Martínez Ramírez, si bien ameritan la investigación del Procurador General de Puerto Rico, se limitan a deberes estrictamente notariales sujetos a responsabilidad disciplinaria, pero no así a responsabilidad civil debido al principio de prescripción.

B.   Erró el Honorable Tribunal de Instancia en su interpretación y aplicación del derecho a los hechos del caso.

C.   Erró el Honorable Tribunal de Instancia al excluir evidencia pertinente.

D.   Erró el Honorable Tribunal de Instancia en su apreciación de la prueba."[14]

Decidimos revisar y expedimos el auto de revisión solicitado.

## II

Por estar íntimamente relacionados, procederemos a discutir conjuntamente los dos (2) primeros señalamientos

_____

[13] Cabe señalar que los dos (2) primeros señalamientos de error van dirigidos a cuestionar la conclusión del tribunal de instancia a los únicos efectos de que las actuaciones irregulares del abogado-notario Martínez Ramírez no generan responsabilidad civil debido al principio de prescripción.

[14] Debido a la conclusión a la que llegamos, no es necesario que discutamos los dos (2) últimos señalamientos de error.

de error. Debemos señalar que no es correcta la conclusión del tribunal de instancia a los efectos de que esté prescrita la reclamación en daños contra el abogado-notario Martínez Ramírez por negligencia profesional. Tal conclusión se basa en la interpretación errónea del derecho vigente. Veamos por qué.

El tribunal de instancia determinó que "[l]as omisiones cometidas por el Lcdo. Martínez según las alegaciones de los demandantes y la prueba desfilada ante este Tribunal, constituyen violaciones a deberes estrictamente notariales. Fuera de éstas, la parte demandante no demostró la existencia de un compromiso contractual que hubiese sido incumplido por el codemandado. Toda vez que según la prueba vertida ante este Tribunal, lo que se imputa al Lcdo. Martínez es el cumplimiento defectuoso de sus deberes como notario, es menester concluír [sic] la aplicabilidad del período prescriptivo de 1 año dispuesto por el Art. 1868 del Código, 31 L.P.R.A. 5298". Tal determinación está reñida con lo dispuesto en la Ley Notarial de Puerto Rico, vigente al momento de los hechos, y el caso normativo de *Chévere v. Cátala*, 115 D.P.R. 432 (1984). Expliquémonos.

■  Un notario puede responder civilmente por los daños causados debido a su negligencia profesional. El término prescriptivo para instar la acción dependerá de si la obligación contraída por el notario es contractual o extracontractual. Es decir, si la obligación es contractual, el término prescriptivo para instar la acción en daños es de quince (15) años. Art. 1864 del Código Civil, 31 L.P.R.A. sec. 5294. Por el contrario, si se limita a sus deberes notariales y como resultado de ello causa un daño, entonces le será aplicable el plazo de un (1) año asignado a las acciones extracontractuales. Art. 1868 del Código Civil, 31 L.P.R.A. sec. 5298. De manera que la naturaleza de la responsabilidad civil del abogado-notario estará supeditada a la valoración que se haga de los hechos.

A tales efectos, en *Chévere v. Cátala*, supra, págs. 441–442, endosamos las siguientes conclusiones del trata-dista Giménez–Arnau sobre la responsabilidad civil:

> "[N]os parecen aceptables ... la responsabilidad civil del Notario puede ser de naturaleza contractual o extracontractual. El mero dato de haber obtenido del Notario la prestación de sus funciones no permite presumir el carácter contractual de la res-ponsabilidad; por el contrario, es preciso adoptar como criterio general la responsabilidad de origen extracontractual siempre que la labor del Notario se haya limitado a la esfera de sus deberes como funcionario; quien pretenda que la responsabili-dad es de otra naturaleza tiene la carga de probar la existencia de un contrato de tipo determinado." (Énfasis en el original suprimido.)

■ Tras examinar la Ley Notarial vigente al ocurrir los hechos, Ley Núm. 99 de 27 de junio de 1956 (4 L.P.R.A. sec. 1001 n.) y la actual Ley Notarial de Puerto Rico, Ley Núm. 75 de 2 de julio de 1987 (4 L.P.R.A. sec. 2001 *et seq.*), no encontramos en éstas disposición alguna que imponga al notario la obligación de presentar los documentos al Re-gistro de la Propiedad como parte de sus funciones inhe-rentes al ejercicio del notariado. Sin embargo, el notario, como parte de sus funciones, tiene el deber de informarle al cliente la necesidad de presentar inmediatamente la escri-tura de hipoteca ante el Registro de la Propiedad. En espe-cial, deberá llamarle la atención acerca de las consecuen-cias que para él podría tener el no hacerlo. *In re Flores Torres*, 119 D.P.R. 578, 585–586 (1987).

■ Surge con meridiana claridad que la presentación de documentos al Registro de la Propiedad constituye una obligación contractual convenida por las partes, la cual no forma parte de las responsabilidades inherentes al ejerci-cio del notariado. En otras palabras, se acuerda y se cons-

tituye un contrato de mandato.([15]) Debemos entonces determinar si en el presente caso surgió dicho convenio.

La parte demandada, licenciado Martínez Ramírez, aceptó en todo momento que él se comprometió a presentar para inscripción en el Registro de la Propiedad la Escritura Núm. 279. Así también lo hace constar el tribunal de instancia en sus determinaciones de hecho. Por lo tanto, la parte demandante probó la existencia del contrato de mandato. La propia parte demandada recurrente así lo aceptó. De manera que habiéndose constituido un contrato de mandato entre las partes, la acción contra el licenciado Martínez Ramírez no había prescrito.

En virtud de lo anteriormente expresado, *se dictará sentencia modificando en parte la sentencia emitida por el Tribunal Superior, Sala de Mayagüez, el 20 de enero de 1989, a los únicos efectos de determinar que no está prescrita la causa de acción contra el licenciado Martínez Ramírez y se devuelve el caso al tribunal de instancia para que continúen los procedimientos, según lo aquí dispuesto.*([16])

El Juez Asociado Señor Negrón García se inhibió. El Juez Asociado Señor Alonso Alonso no intervino. El Juez Asociado Señor Fuster Berlingeri concurrió sin opinión escrita.

---

([15]) El contrato de mandato se define como aquél en que "se obliga una persona a prestar algún servicio o hacer alguna cosa, por cuenta o encargo de otra". Art. 1600 del Código Civil, 31 L.P.R.A. sec. 4421.

([16]) La alegada conducta irregular del notario Martínez Ramírez requiere que ordenemos al Procurador General que realice una investigación e informe sobre la misma.