*In re* WENDELL WILLIAM COLÓN MUÑOZ, querellado.

*Número:* 3882 *Resuelto:* 30 de junio de 1992

*Govén D. Martínez Surís, Director de la Oficina de Inspección de Notarías; Eugenio Otero Silva, de Trías, Doral, Muñoz, Acevedo & Otero, Pedro Ortiz Álvarez, de González, Bennazar & Colorado, Arturo Negrón García y S.L. Lagarde Garcés*, abogados del querellado.

El Juez Asociado Señor Alonso Alonso emitió la opinión del Tribunal.

El presente caso nos brinda la oportunidad de reafirmar las normas y doctrinas sobre la naturaleza y la función notarial; del fiel cumplimiento que los notarios deben dar a las leyes que regulan el ejercicio de la notaría; sobre los procedimientos de suspensión del ejercicio del notariado; las facultades de este Tribunal sobre el ejercicio del notariado y las sanciones que puede imponer.

 De entrada, ubicamos las controversias ante nos dentro de la naturaleza y las funciones del notario de tipo latino existente en Puerto Rico.[1] En apretada síntesis, el notario latino es aquel profesional del Derecho *que ejerce una función pública* que consiste en recibir, interpretar y dar forma legal a la voluntad de las partes, dar fe de los hechos, redactar los instrumentos adecuados a ese fin, conferirles autenticidad, conservar los originales de éstos y expedir copias que den fe de su contenido. En dicha función el notario puertorriqueño representa la fe pública y la ley para todas las partes. *De ahí que, entre otras, debe dar el más fiel cumplimiento a la Ley Notarial de Puerto Rico, así como a las leyes fiscales que regulan el cobro de derechos en*

---

[1] Para 1991 había cuarenta y dos (42) países de Europa, América, Asia y África que eran miembros de la Unión Internacional del Notariado Latino, a saber: Alemania, Argentina, Austria, Bélgica, Benín, Bolivia, Brasil, Canadá, Colombia, Costa de Marfil, Costa Rica, Chile, Ecuador, El Salvador, España, Francia, Grecia, Guatemala, Haití, Holanda, Honduras, Italia, Japón, Louisiana (U.S.A.), Luxemburgo, Malí, Marruecos, México, Mónaco, Nicaragua, Paraguay, Perú, Portugal, Puerto Rico, República Dominicana, San Marino, Senegal, Suiza, Turquía, Uruguay, Vaticano, Venezuela. Revista del Notariado (Unión Internacional del Notariado Latino) Separata Núm. 823 (1991).

*los instrumentos públicos que autorice al momento de las partes otorgar éstos.*([2])

■ Como profesional del Derecho tiene la misión de asesorar a quienes reclamen su ministerio y aconsejarles los medios jurídicos más adecuados para el logro de los fines lícitos que aquéllos se proponen alcanzar.

■ En su función pública ejerce la fe pública notarial, la cual conlleva un doble contenido, a saber: (1) en la esfera de los hechos, la exactitud de lo que el notario ve, oye o percibe por sus sentidos, y (2) en la esfera del Derecho confiere autenticidad y fuerza probatoria a las declaraciones de voluntad de las partes en el instrumento público redactado conforme a su juicio sobre los preceptos del ordenamiento jurídico para la validez y. eficacia del acto o contrato formalizado, y sobre la identidad y capacidad de las partes.([3])

■ El notario disfruta de plena autonomía e independencia en su función, sujeto solamente *en organización jerárquica a este Tribunal* y a nuestra dirección administrativa a través de la Oficina de Inspección de Notarías.

■ En el ejercicio de su ministerio y en el descargo de la fe pública en él depositada, el notario no puede tomar

---

([2]) Resolvemos la presente controversia a tenor con las disposiciones de la Ley Núm. 99 de 27 de junio de 1956 (4 L.P.R.A. ant. sec. 1001 *et seq.*), por ser la ley vigente al momento del notario autorizar los instrumentos objeto de inspección. Esa ley fue derogada por la Ley Núm. 75 de 2 de julio de 1987 (4 L.P.R.A. sec. 2001 *et seq.*). Sin embargo, el análisis y resultado del caso sería el mismo bajo ambas leyes.

([3]) Arts. 2 y 7 de la Ley Núm. 75 de 2 de julio de 1987 (4 L.P.R.A. secs. 2002 y 2011); *Pueblo v. Central Cambalache*, 62 D.P.R. 553 (1943); *In re Meléndez Pérez*, 104 D.P.R. 770 (1976); *In re Lavastida et al.*, 109 D.P.R. 45 (1979); *Chévere v. Cátala*, 115 D.P.R. 432 (1984); *In re Carreras Rovira y Suárez Zayas*, 115 D.P.R. 778 (1984); *In re Raya*, 117 D.P.R. 797 (1986); *In re Flores Torres*, 119 D.P.R. 578 (1987); *In re Nieves Rivera*, 124 D.P.R. 803 (1989); *Pueblo v. Flores Betancourt*, 124 D.P.R. 867 (1989); *Kogan v. Registrador*, 125 D.P.R. 636 (1990); *In re Cruz Cruz*, 126 D.P.R. 448 (1990); *In re Cruz Ramos*, 127 D.P.R. 1005 (1991). Véanse, además: P. Ávila Álvarez, *Estudios de Derecho Notarial*, 6ta ed., Barcelona, Ed. Bosch, 1986, pág. 24; Acuerdos del Ier Congreso Internacional del Notariado Latino; R. Lago, *Estudios de Derecho Notarial*, Madrid, Inst. de España, 1986, T. I, págs. 484–485; *Diccionario de Derecho Civil*, Ed. Aranzadi, S.A., 1984, págs. 249–250.

partido o bando porque él representa la ley para todas las partes. Su obligación de ilustrar, orientar y advertir ha de desplegarla para todos por igual, con imparcialidad.(4)

El notario del *common law*, por el contrario, no es un jurista o abogado y su función se limita al reconocimiento y autenticación de firmas. Este tipo de notario existe en los países siguientes: Estados Unidos, Gran Bretaña, Australia, Nueva Zelandia, Canadá (excepto Quebec), India, Malasia, Singapur, Hong Kong y Nigeria, entre otros. Revista del Notariado, Separata Núm. 823 (1991), *supra*.

Con este marco conceptual y jurídico, orientando nuestro curso decisorio, a continuación examinamos los antecedentes del caso ante nos; hacemos el análisis doctrinario correspondiente; evaluamos los hechos y los planteamientos del notario querellado e imponemos la sanción correspondiente.

## I

El Lcdo. Wendell William Colón Muñoz fue admitido al ejercicio de la abogacía el 16 de diciembre de 1971 y al de la notaría el 16 de febrero de 1972.

Las inspecciones de su notaría para los años 1972 al 1980 reflejan que ésta fue examinada y aprobada como correcta, y en cumplimiento de la Ley Notarial de Puerto Rico y las formalidades de las leyes aplicables, por la Oficina de Inspección de Notarías de este Tribunal.

Posteriormente, y mediante nuestra Resolución de 20 de agosto de 1981, le impusimos al notario Colón Muñoz una

---

(4) *Cf.* La Exposición de Motivos y el Art. 3 de la nueva Ley Notarial de Puerto Rico, Ley Núm. 75 de 2 de julio de 1987 (4 L.P.R.A. sec. 2002); *In re Meléndez Pérez*, supra; *In re Cancio Sifre*, 106 D.P.R. 386 (1977); *In re Feliciano*, 115 D.P.R. 172 (1984); *Chévere v. Cátala*, supra; *In re Raya*, supra; *In re Del Río Rivera y Otero Fernández*, 118 D.P.R. 337 (1987); *In re Serrano Casanova*, 127 D.P.R. 482 (1990); *In re Bringas Rechani*, 128 D.P.R. 132 (1991).

multa de cien dólares ($100) por haber remitido tardíamente la certificación de cierta escritura de protocolización de poder.

## A. *Antecedentes del caso*

El 4 de enero de 1988 el Director de la Oficina de Inspección de Notarías, Lcdo. Govén D. Martínez Surís (en adelante el Director) nos remitió un informe relativo al protocolo del notario Wendell W. Colón Muñoz expositivo de serias deficiencias en su obra notarial. Específicamente expuso que, *a partir de 28 de diciembre de 1987*, el Inspector de Protocolos, Lcdo. Jorge L. Yordán (en adelante Inspector Yordán), examinó esa obra desde 1981 a 1986. Tal examen finalizó el 14 de octubre de 1988.[5] Como resultado de esa inspección se detectaron un sinnúmero de deficiencias documentales en torno a la firma, iniciales, estado civil de varios otorgantes en diversas escrituras *y, además, la omisión de no haber adherido y cancelado o haber adherido y cancelado insuficientes sellos de rentas internas e impuesto notarial en cuatro mil doscientos veintiocho (4,228) escrituras por un valor de cincuenta mil veinticuatro dólares ($50,024).*[6] *El notario Colón* fue notificado *por el inspector Yordán de estas deficiencias el 29 de noviembre de 1988 y no había respondido al referido informe rendido por éste.*

En su comunicación a este foro, el Director prudencialmente consignó correctamente el criterio de que era de pre-

---

[5] La obra notarial del licenciado Colón Muñoz para ese período comprende noventa (90) tomos que contienen cinco mil ciento ochenta y tres (5,183) instrumentos públicos en los cuales se cancelaron aproximadamente quinientos mil dólares ($500,000) en sellos de rentas internas. Como se notará, la obra notarial es una voluminosa.

[6] Se desglosan del modo siguiente:

Año 1981, 15 tomos, 713 escrituras, total $2,340.75; año 1982, 14 tomos, 635, total $4,929.50; año 1983, 12 tomos, 560 escrituras, total $6,262.00; año 1984, 10 tomos, 489 escrituras, total $6,997.25; año 1985, 16 tomos, 777 escrituras, total $9,212.75, y año 1986, 23 tomos, 1,054 escrituras, total $20,281.75.

sumir, que según estas deficiencias eran detectadas e informadas al notario, éste demostraría interés y las corregiría. Para su sorpresa, nos indicó que no fue así. En esas circunstancias, *con carácter urgente*, nos refirió el asunto.

El Director unió a su comunicación el memorando del Inspector Yordán de 29 de noviembre de 1988, y su informe consistente de ochenta y ocho (88) páginas. En el memorando, que acompaña dicho informe, el Inspector *Yordán indicó que se le estaba remitiendo copia de éste al notario Colón Muñoz.*

Con vista a esta exposición de hechos y el conocimiento obvio del notario Colón Muñoz de esta situación, coincidimos con el Director de que estábamos ante una *situación alarmante* que en protección de los intereses públicos y privados implicados, ameritaba nuestra más pronta intervención y corrección disciplinaria. El tiempo transcurrido —*seis (6) años*— *su efecto acumulativo y la pasividad del notario Colón Muñoz en cumplir su deber ministerial así lo reclamaban.* La magnitud de las deficiencias a nivel económico rebasaba incluso el máximo actual de quince mil dólares ($15,000) que la nueva Ley Notarial de Puerto Rico exige como fianza garantizadora para responder por incumplimiento de la ley y los daños que esta práctica pudiera generar.

Más allá del aspecto fiscal, en lo sustantivo, hasta tanto estos sellos fuesen adheridos y cancelados, la validez de las escrituras o de las copias certificadas estaban en entredicho, pues éstas eran anulables e ineficaces.[7]

Ante estas circunstancias, el 26 de enero de 1989 orde-

---

[7] Véanse: Art. 10 de la Ley Notarial de Puerto Rico, 4 L.P.R.A. sec. 2021; *Banco de Santander de P.R. v. Registrador*, 115 D.P.R. 44 (1984); *Rivera Cabrera v. Registrador*, 113 D.P.R. 661 (1982); *Inspector de Protocolos v. Dubón*, 107 D.P.R. 50 (1978); *Empire Life Ins. Co. v. Registrador*, 105 D.P.R. 136 (1976); *Sánchez v. Registrador*, 69 D.P.R. 474 (1949); *In re Feliciano*, supra; *In re Merino Quiñones*, 115 D.P.R. 812 (1984); S. Torres Peralta, *La nueva Ley Notarial de Puerto Rico*, 48 (Núm. 3) Rev. C. Abo. P.R. 3, 104 (1987); P. Malavet Vega, *Manual de Derecho Notarial puertorriqueño*, Santo Domingo, Ed. Corripio, 1988, págs. 115–116.

namos de inmediato la suspensión provisional del notario Colón Muñoz del ejercicio de la notaría e instruimos al Alguacil de este Tribunal para que se incautara de su obra notarial para el examen posterior por parte del Director.

Simultáneamente le concedimos al notario Colón Muñoz un término de veinte (20) días para que compareciera por escrito a mostrar causa por la cual no debía ser suspendido definitivamente de la notaría y separado del ejercicio de la profesión legal.

*El 27 de enero de 1989*, cumpliendo con nuestro mandato, el alguacil de este Tribunal se incautó de la obra notarial del licenciado Colón Muñoz y la colocó bajo la custodia y examen del Director a los fines de subsanar las deficiencias de las firmas, iniciales, estado civil de varios otorgantes, la omisión de haber adherido sellos de rentas internas e impuesto notarial y otros extremos.

El 31 de enero de 1989 el notario Colón Muñoz presentó ante este Foro un escrito, debidamente juramentado, denominado "Moción solicitando remedio urgente" en el que, en síntesis, sostenía que la deficiencia imputada de cincuenta mil dólares ($50,000) en sellos *se deb[ía] esencialmente a una discrepancia de criterio entre el notario y el Inspector Yordán en cuanto a la forma de computar la cuantía de sellos de rentas internas a ser cancelados en las escrituras de constitución de hipoteca*"; que existió una dilación de cuatro (4) años en la inspección de sus protocolos atribuible a la falta de personal de la Oficina de Inspección de Notarías; que durante la inspección de sus protocolos el Inspector Yordán informaba de cuando en cuando las faltas al notario y éste corrigió las que entendía procedentes; que conforme a "la práctica [vigente] en el área sur y oeste" (Moción solicitando remedio urgente, pág. 2) en cuanto a la forma de determinar la cuantía de sellos de rentas internas que se cancelarían en las escrituras de constitución de hipoteca —según la cual no se incluía en el cómputo créditos adicionales sino que se determina a base del principal

de la hipoteca— él no cobró a los otorgantes las sumas de dineros correspondientes a sellos de rentas internas adicionales, por lo que tendría que pagar de su peculio tales sellos si se determinara que procede tal cancelación de sellos por créditos adicionales; que el 29 de noviembre de 1988 el Inspector Yordán remitió su informe al Director sin consignar la divergencia de criterio existente y sin determinar si las faltas informadas habían sido corregidas, y sin enviarle copia del informe al notario querellado; (8) que el Director remitió el referido informe al entonces Juez Presidente de este Foro (Hon. Víctor M. Pons Núñez) sin concederle oportunidad de corregir las faltas y sin notificarle el memorando de trámite, y que dado el voluminoso número de protocolos y de años objeto de examen —y siendo la mayor parte de los instrumentos públicos en dichos protocolos, escrituras de constitución de hipoteca y la deficiencia imputada de carácter repetitivo— el informe del Inspector Yordán, en el que no se hace constar la diferencia de criterio existente, "lleva a la conclusión errada de que el compareciente est[á] violando repetidamente su obligación de cancelar los sellos de rentas internas para su lucro personal". Moción solicitando remedio urgente, pág. 4.

Finalmente, en la "Moción solicitando remedio urgente", el licenciado Colón Muñoz expuso su análisis de cuál es el procedimiento que se sigue en la práctica para dilucidar divergencias de criterio entre el notario y el Inspector de Notarías y concluyó que este Foro "sin oir al querellado —sin existir reglamento [notarial] alguno [que regule esa práctica;] sin que se diera cumplimiento previo al procedimiento prevaleciente [en la práctica]; la Ley Notarial y el debido proceso de ley llegó a [unas] conclusiones y dictó una Resolución que le perjudica más allá de lo justo y razonable". Moción solicitando remedio urgente, pág. 6.

---

(8) Sin embargo, reconoce que el memorando de trámite de dicho informe indica que se estaba enviando copia al querellado.

Por todo ello, en la súplica de la referida moción y sin admitir responsabilidad, solicitó que:

1. Dado el hecho de que la Resolución dictada por este Honorable Tribunal afecta tanto el buen nombre del compareciente como su medio de vida, causándole daños substanciales, continuos e irreparables, le de prioridad a la presente Moción.

2. Deje sin efecto la suspensión provisional del querellado, en lo que se dilucidan de conformidad con las disposiciones legales aplicables las controversias objeto del procedimiento de epígrafe.

3. Ordene la devolución al querellado de sus protocolos y registros de affidavits (sic).

4. A los fines de completar el examen de los protocolos y registros de affidavits (sic) del querellado, instruya al Director de Inspección de Notarías que nombre un Inspector para que los examine, conforme al procedimiento prevaleciente, reconociendo al querellado los derechos y/o las oportunidades que el procedimiento prevaleciente, la Ley Notarial y el debido proceso de ley les conceden a los notarios en el Estado Libre Asociado de Puerto Rico, inclusive la oportunidad de recurrir al Tribunal Superior para dilucidar cualesquiera diferencias de criterio.

5. Admita la fianza y/o garantía solidaria y judicial prestada por el querellado a los fines de garantizar fielmente el cumplimiento de todas sus obligaciones como tal, más allá de cualquier otra fianza notarial o judicial prestada anteriormente, específicamente la fianza notarial prestada previamente por el querellado. Moción solicitando remedio urgente, págs. 6–7.

En abono de su pedido, unió dos (2) declaraciones juradas: una del notario Raúl Matos y otra del notario Antonio Zapater Cajigas. En la del primero, el notario Raúl Matos consignó que hasta 1980, la práctica en el área de Ponce —por muchos años y sancionada por el Inspector de Protocolos— era computar y cancelar sellos de rentas internas en las escrituras de hipoteca tomando en cuenta solamente el principal y no cualesquiera otros créditos adicionales incluidos en ellas. Por su parte, el notario Zapater Cajigas confirmó lo anterior, aunque no expuso año alguno. Además, en su moción el notario Colón Muñoz acompañó declaraciones juradas de su Secretaria Ejecutiva Sarath Ri-

vera Gandía y las secretarias Manuelita Velázquez Díaz y Daisy Pascual Emmanuelli, aseverando que en tales capacidades *nunca se recibió* ni han visto el informe del Inspector de Protocolos, licenciado Yordán, o del licenciado Martínez Surís relacionado con las deficiencias aludidas.

Finalmente, el notario Colón Muñoz adhirió fotocopia de un cheque oficial del Ponce Federal Bank, F.S.B., a nombre del Secretario del Tribunal Supremo, por la suma total de las mencionadas deficiencias, ascendente a $50,024. Sobre este último aspecto, el Secretario General, Lcdo. Francisco R. Agrait Lladó, unió al expediente el Memorando de 31 de enero de 1989 en el que explicaba que la Secretaría decidió no aceptar dicho cheque (por no estar autorizada a ello) lo cual en reunión comunicó al licenciado Colón Muñoz y a su abogado.

A base de su súplica, *el mismo 31 de enero de 1989* acogimos la moción de remedio urgente como una reconsideración y dejamos sin efecto nuestro dictamen de *26 de enero de 1989* suspendiéndolo provisionalmente del ejercicio del notariado hasta tanto otra cosa dispusiéramos. *Sin embargo*, más allá de la controversia y las diferencias de criterios en cuanto al arancel notarial a que aludía dicho notario en su moción ante nos, *surgían del informe del Inspector Yordán deficiencias en cuanto a la firma, las iniciales, el estado civil de varios otorgantes y el impuesto notarial. Por la cuantía involucrada, algunas deficiencias podían trascender la alegada divergencia de criterios.*

Por ello, dispusimos que el Director, a los fines de su informe final, reexaminara la obra notarial. Para ello lo autorizamos a retener los protocolos incautados hasta 1988, incluso. Ordenamos, además, que la documentación correspondiente a la obra notarial del año en curso podía ser entregada al notario Colón Muñoz a su requerimiento.

El *7 de febrero de 1989* el Director nos solicitó un término de unos días adicionales para rendir un informe respecto a los protocolos del notario. Adujo que la obra nota-

rial de 1981 a 1986 era voluminosa al igual que la de 1987. Señaló, además, que *debido al interés del notario de cubrir aquellas deficiencias que no ha objetado,* la reinspección había conllevado, además de verificar las deficiencias señaladas por el inspector Yordán, la comprobación de la corrección de éstas. En vista de esta solicitud le concedimos un término adicional para rendir su informe hasta el *15 de febrero de 1989.*

El *15 de febrero de 1989* el Director nos rindió su informe de reinspección de la obra notarial que tenía bajo su custodia correspondiente a los años 1981 a 1986 y de inspección de protocolo de 1987 que todavía no había sido inspeccionado por el Inspector Yordán. Expresó en dicho informe que al reexaminarse los protocolos hasta 1986 y al examinar por primera vez el de 1987 se abarcaron todos los aspectos arancelarios como también las formalidades de la Ley Notarial de Puerto Rico aplicable al momento del otorgamiento.

Señaló también que, a solicitud del notario, permitió que *éste estuviera presente y observara la reinspección* de sus protocolos de 1981 a 1986 y la inspección inicial del correspondiente a 1987. *El notario expresó interés en adherir y cancelar en las escrituras matrices aquellos derechos por deficiencias en sellos que, luego de verificadas por el inspector y aceptadas por el notario, no constituían los créditos garantizados en las escrituras de hipotecas objetadas por dicho notario.*

Expresó, además, en su informe que:

Las deficiencias *que corrigió el notario se habían señalado en el informe pormenorizado que se sometió a este Hon. Tribunal al referirse este caso,* pero habiéndose corregido en el proceso de reinspección, ahora las hemos señalado con un asterisco a la izquierda. *Quedan subsistentes las demás deficiencias de créditos no exentas por haberse objetado.*

Aclaró que:

Ciertamente el Inspector Lic. Yordán no desglosó en su informe las cantidades que pertenecían a los créditos garantiza-

dos *no exentos* en disputa, pero a nuestro juicio, esto no altera el monto de las deficiencias señaladas habiendo como *refuerzo* de nuestro señalamiento los dos casos adjudicados a nuestro favor. *No pasamos por alto que las deficiencias por el mismo concepto señaladas al notario Wendell William Colón Muñoz por el Inspector Edgardo Ortiz Bauzá al examinarle el protocolo de 1980, fueron subsanadas en los 15 tomos que integran 787 escrituras casi todas de hipotecas.*

. . . . . . . . .

*Es propio hacer constar que salvo los casos en que se indica que la escritura no tenía ningún sello, todas las demás tenían sellos cancelados aunque no fuera por la cantidad correcta que debiera tener a nuestro juicio.* (Énfasis suplido.)

El *16 de febrero de 1989*, respondiendo a una solicitud del notario, instruimos al Director para que notificara al notario con copia del informe que éste nos había presentado el *15 de febrero de 1989* y le concedimos término al licenciado Colón Muñoz para que expusiera lo que tuviera a bien con relación a tal informe.

El *9 de marzo de 1989* el notario compareció ante nos y expresó su posición sobre el referido informe y en cuanto al procedimiento utilizado en su caso. Esencialmente reformuló sus argumentos esbozados en la "Moción solicitando remedio urgente" de 31 de enero de 1989.

El *11 de mayo de 1989* emitimos una resolución en la que expusimos, *inter alia*, que:

De las comparecencias del notario Lic. Colón Muñoz y de la comunicación del 15 de febrero del Director de Inspección de Notarías, se desprende lo siguiente: 1) que durante un período de tiempo de aproximadamente diez (10) meses, desde la semana que comenzó el 28 de diciembre de 1987 hasta la semana que finalizó el 14 de octubre de 1988, se llevó a cabo una inspección de la obra notarial del Lic. Colón Muñoz por el Inspector de Protocolos Lic. Jorge Jordán (sic); 2) que éste visitó periódicamente, según sus funciones se lo permitían, la oficina del notario para examinar su obra notarial y que éste siguió la práctica ordinaria en el Estado Libre Asociado de Puerto Rico de informar informalmente al notario las faltas que entendía se habían cometido, a los fines de que éste las corrigiera, o de otro modo informara por qué entendía que no se habían incurrido;

3) que el inspector fue informando de cuando en cuando al querellado de las faltas que entendía se habían incurrido; 4) que el notario Lic. Colón Muñoz corrigió algunas de las faltas señaladas por el Inspector Lic. Jordán.

De la comparecencia del 9 de marzo del notario Colón Muñoz y de la comunicación del 15 de febrero del Director de Inspección de Notarías remitiéndonos copia del informe de la obra notarial a dicha fecha, surge además, que el notario Lic. Colón Muñoz *estuvo presente durante el proceso de reinspección que se llevó a cabo en la Oficina del Director de Inspección de Notarías y que éste corrigió las faltas y deficiencias, tanto de sellos sin cancelar, así como en cuanto a la firma, iniciales, estado civil de varios otorgantes e impuesto notarial, cuyas faltas y deficiencias habían sido señaladas informalmente por el licenciado Jordán (sic) y formalmente el 29 de noviembre de 1988 en su informe por escrito. Esto constituye una aceptación del notario Lic. Colón Muñoz de que dichas faltas y deficiencias subsistían hasta el momento de la reinspección. Surge además, que el notario Lic. Colón Muñoz subsanó durante el período de inspección $24,610.25 de deficiencias en sellos que se le habían señalado en el informe del inspector Lic. Jordán* (sic). (Énfasis suplido.) Resolución de mayo de 1989, pág. 2.

## En dicha resolución, además, ordenamos:

Visto lo anterior, conforme lo solicitado por el notario Lic. Wendell William Colón Muñoz y lo dispuesto por ley, se instruye al Lic. Govén Martínez Surís, Director de Inspección de Notarías, que siguiendo el procedimiento dispuesto por el Art. 63 de la Ley Núm. 75 de 2 de julio de 1987 (Ley Notarial de P.R.), someta al Tribunal Superior, Sala de Ponce, los escritos correspondientes para que este *resuelva las controversias existentes sobre créditos no exentos* garantizados con hipotecas y que según su informe del 15 de febrero de 1989 ascienden a la suma de $27,402.83.[9]

---

[9] El Director de la Oficina de Inspección de Notarías (en adelante el Director) presentó, el 24 de mayo de 1989, en el Tribunal Superior, Sala de Ponce, el "Informe del Inspector", Civil Núm. 89-1094, *Lcdo. Govén Martínez Surís v. Lcdo. Wendell William Colón Muñoz*, sobre divergencias de criterio respecto a la cancelación de sellos de rentas internas y, en particular, la controversia existente sobre créditos no exentos garantizados con hipotecas y que ascendía a veintisiete mil cuatrocientos dos dólares con ochenta y tres centavos ($27, 402.83). El Tribunal Superior dictó sentencia en dicho caso el 22 de enero de 1990, la cual se notificó el 23 de enero de 1990. De dicha sentencia recurrió ante nos el Director de la Oficina de Inspección de Protocolos el pasado 20 de febrero de 1990 mediante recurso de *certiorari*, CE-90-137, por

Se ordena, además, al notario Lic. Wendell William Colón Muñoz, que dentro de un término de veinte (20) días, contado a partir de la notificación de esta resolución, muestre causa por la cual no debemos disciplinarlo como abogado y notario, sin ulterior trámite en *vista de su aceptación de que incurrió en las faltas y deficiencias que a continuación se enumeran según surge del Informe del Director de Inspección de Notarías de 15 de febrero de 1989.* Algunas de ellas acarrean la nulidad de documentos otorgados y pueden causar daño irreparable a derechos de terceros. *Estas faltas y deficiencias no son las divergencias de criterio contempladas por el Art. 63 de la Ley Núm. 75 de 2 de julio de 1987 (Ley Notarial), sino incumplimiento con la Ley Notarial.* Sobre las mismas este había sido informado anteriormente por el Inspector Lic. Jordán durante el período en que inspeccionó su obra notarial y sobre las cuales tuvo oportunidad de corregirlas durante el período de inspección de su obra notarial y no lo hizo. (Énfasis suplido.) Resolución de 11 de mayo de 1989, pág. 3.

*En síntesis, las faltas y las deficiencias subsistentes al momento de la reinspección y corregidas por el notario licenciado Colón Muñoz —según se desprende de la comunicación e informe de 15 de febrero de 1989 del Director— eran las siguientes:*

1. *Existían sesenta (60) escrituras* desde *1981 hasta 1987 que no tenían sello* alguno.

2. *Había cincuenta y una (51) escrituras desde 1981 hasta 1987 en las que faltaban las firmas de los otorgantes y/o testigos.*

3. *Existían, desde 1981 hasta 1987, veintinueve (29) escrituras sin iniciales.*

4. *Existían treinta y tres (33) escrituras en las cuales no estaba claro o no se indicó el estado civil de los comparecientes en los años comprendidos entre 1981 y 1986.*

5. *Había un total de cincuenta y tres (53) escrituras desde 1985 hasta 1986 en las que faltaba el sello del notario.*

6. *Había siete (7) escrituras en el período comprendido*

---

ésta haberle sido adversa a él.

*entre 1981, 1982 y 1986 que aparecían sin la firma del notario.*

*7. Existían sesenta y seis (66) escrituras en que, para 1981, 1983, 1985 y 1986, faltaba la firma del notario en la nota de saca.*

*8. Había un total de tres (3) escrituras de 1981 en las que faltaba la firma y el sello en la nota de apertura* de protocolo.

*9. Había un total de tres (3) escrituras en 1981 y 1986 en las que faltaba la firma y el sello en la nota de cierre* del protocolo.

*10. El protocolo de 1987 estaba sin encuadernar.*

*11. Había un total de nueve (9) escrituras de hipotecas que no tenían sello alguno para 1984 y 1986.*

*12. En 1981 había una (1) escritura en la cual el día del otorgamiento se indicó en guarismos.*

*13. Había seis (6) escrituras (de 1981 a 1986) con folios y/o espacios en blanco.*

*14. En 1987 había una (1) escritura en la que no se expresó la cuantía del pagaré* cancelado.

*El 18 de mayo de 1989,* a solicitud del Director, ordenamos al notario que encuadernara los protocolos correspondientes desde 1987 hasta 1988, gestión que se llevó a cabo.

El *31 de mayo de 1989* el notario presentó su escrito para mostrar causa y solicitud de continuación de los procedimientos. En éste nos solicita que le permitamos presentar prueba testifical y documental. Además, sostuvo en su escrito que el desarrollo procesal de la intervención con su obra notarial lo colocó en una situación injusta.

Según el notario, antes de nuestra intervención en el caso, "nunca tuvo un cuadro completo de las posiciones del Inspector" (Comparecencia para mostrar causa y solicitando continuación de los procedimientos, pág. 4), por lo que no podemos presumir que estuvo plenamente advertido de todas las deficiencias encontradas en las etapas del proceso de inspección notarial ni presumir que se cruzó de

brazos ante los hallazgos esperando corregir tales deficiencias luego de la reinspección que hiciera el Director.

Sostiene que:

Cuando el Tribunal Supremo dictó su resolución del 26 de enero de 1989, el notario querellado había corregido la mayoría de las faltas o deficiencias informadas informalmente por el Inspector.[10] Quedaban algunos sellos por cancelar, aparte de los que corresponden a la divergencia de criterio principal, que, como ilustran los Anejos A, B, C, D, E, F y G, es materia de discusión aún entre el Inspector y Director de Inspección de Notarías y pueden atribuírse a errores de buena fe e incluso a divergencias de criterio que no se han planteado para no complicar aún más este caso. También quedaban por subsanar otras faltas, principalmente las referentes al estado civil, cuya corrección es ordinariamente posterior a una discusión entro el Inspector y el notario, que en este caso no se produce hasta la reinspección ordenada por el Tribunal Supremo. Comparecencia para mostrar causa y solicitando continuación de los procedimientos, pág. 5.

Finalmente, luego de exponer los criterios que según él debemos utilizar al evaluar si su conducta merece sanción disciplinaria (actitud de notario; naturaleza de las faltas o deficiencias y perjuicio a otorgantes y terceros) y de exponer su historial profesional, trámite seguido en su caso, y el estado general de su notaría, éste nos suplica que:

A. Exonere al notario querellado, así como tampoco se le sancione en forma alguna, porque su conducta no demuestra contumacia, dejadez, deshonestidad o falta alguna a un alto sentido de pulcritud, honra y observancia a los principios que rigen el ejercicio del notariado en Puerto Rico y los usos y costumbres consagrados y observados en tal ejercicio.

B. En la alternativa, de estimar que existe cualquier controversia en cuanto a los hechos expresados en el presente escrito, específicamente en cuanto a los usos y costumbres generalmente aceptados en el ejercicio del notariado y el proceso de

---

[10] Según el notario, antes de la incautación de sus protocolos él había cancelado aproximadamente doce mil dólares ($12,000) en sellos de rentas internas en aquellos instrumentos en que el Inspector Yordán informalmente le había informado deficiencias en sellos y en los que no existía divergencia de criterios.

inspección de protocolos, por lo que resulta necesario recibir prueba testifical y documental, designe un Comisionado Especial a tales propósitos.

C. En la alternativa, de determinar que resulta innecesaria la designación de un Comisionado Especial, permita la comparecencia personal del notario querellado ante el Pleno del Honorable Tribunal Supremo, a los fines de la mostración de causa que se le requiere. Comparecencia para mostrar causa y solicitando continuación de los procedimientos, pág. 23.

El *15 de junio de 1989* emitimos resolución dirigida al licenciado Colón Muñoz concediéndole veinte (20) días para mostrar causa por la cual este Tribunal no debía ordenar la eliminación, como "abogado de récord", de todos los abogados que con posterioridad a la primera comparecencia se unieron al caso. Ésta fue motivada por haberse unido al caso diversos abogados, de una u otra forma relacionados con los jueces de este Tribunal y cuya consecuencia implicaba que tres (3) Jueces Asociados de este Tribunal tenían que inhibirse (Hons. Jueces Asociados Señores Negrón García, Ortiz y Alonso Alonso).[11]

Para fines de dicha resolución, participaron todos los Jueces que componían este Tribunal en aquel momento.

El 9 de junio de 1990 compareció el notario y expresó, en síntesis, las razones personales y afectivas que lo motivaron a unir a dichos abogados a su representación legal, aclarando que nunca fue su propósito recusar o inhibir Jueces Asociados de este Foro.

El *11 de octubre de 1989*, luego de hacer un recuento de la comparecencia del notario en relación con su representación legal, expresamos y dispusimos entre otras cosas que:

Ante la situación planteada y en aras de la mayor pureza de

---

[11] El bufete Trías, Doval, Muñoz, Acevedo y Otero representaba al licenciado Colón Muñoz desde el inicio de esta acción. Con posterioridad, y sin solicitar permiso de este Tribunal para ello, se unieron a dicha representación legal los distinguidos letrados Arturo Negrón García, S.L. Lagardé Garcés y Pedro Ortiz Álvarez, que para entonces laboraba en el bufete de abogados González, Bennazar y Colorado.

los procedimientos, tanto real como aparente, —anteponiendo los intereses institucionales a los escrúpulos personales— todos los miembros de este Tribunal reafirman su participación en la consideración y decisión que sobre este asunto corresponda en derecho. *Noriega Rodríguez* v. *Hernández Colón, supra* [88 J.T.S. 1, Op. Per Curiam del 12 de enero de 1988]. Resolución de 11 de octubre de 1989.

El *19 de octubre de 1989* dispusimos sobre una de las súplicas del notario en su comparecencia para mostrar causa. Expresamos y dispusimos en parte:

> Atendiendo el pedido del compareciente el Tribunal le autoriza a presentar, dentro del término de veinticinco días, contados a partir de la notificación de esta resolución, mediante declaraciones juradas todos aquellos testimonios, incluyendo el propio, que estime pertinente a la mostración de causa, así como todas las otras pruebas documentales a que se refiere en su solicitud. [No se incluye el disenso del Juez Asociado Señor Negrón García.] Resolución de 19 de octubre de 1989, pág. 1.

El *16 de junio de 1990* el notario presentó un escrito titulado "Comparecencia especial del querellado" en el cual expuso sus razones para mostrar causa.

En el escrito sostuvo nuevamente que el informe de deficiencia del Inspector Yordán nunca fue discutido con el notario, como era el procedimiento usual y normal de los Inspectores de Notarías, para darle la oportunidad de corregir las deficiencias; que si hubo notificación por correo de dicho informe nunca fue recibida; ([12]) *que lo único recibido fueron las hojas de trabajo que el Inspector Yordán dejaba con su secretaria*, las cuales no eran discutidas con el notario; que no se le advirtió que el asunto podía ser elevado a este Foro; que aun de haber recibido el informe del Inspector Yordán no había tenido la oportunidad real de percatarse de en qué consistía precisamente cada una de las deficiencias porque éstas no se detallaron sino que

---

([12]) Las secretarias del licenciado Colón Muñoz presentaron declaraciones juradas atestando que el referido informe nunca fue recibido en las oficinas del notario.

se mezclaron con la controversia sobre el crédito adicional garantizado por hipoteca que no está expresamente exento; que las deficiencias en el cómputo de sellos de rentas internas —por razones distintas al crédito adicional— encontradas por el Inspector Yordán son *errores de cómputo* cometidos de buena fe y que ocurren normalmente, por lo que se le brinda oportunidad al notario de corregirlas antes de que el Inspector Yordán rinda su informe al Director; que dichas deficiencias no fueron traídas a su atención durante la inspección; que estas deficiencias eran de importancia menor y que el notario nunca se ha resistido o negado a cancelar esos sellos; que en algunas de las escrituras donde se le requirió pago de sellos éstas estaban exentas de tal pago, *e.g.* créditos garantizados por la Farmers' Home Administration (F.H.A.); que las deficiencias en sellos señalados representaban una porción pequeña en relación con los que ya estaban cancelados en su obra notarial; que el notario no se aprovechó o apropió de cantidad alguna pagada por los otorgantes de esas escrituras en concepto de sellos y así lo refleja el hecho de que al momento en que los alguaciles de este Tribunal se incautaron de los protocolos, él tenía bajo su control —y ofreció cancelar— más de cincuenta mil dólares ($50,000) en sellos, y de que en una certificación del Colector de Rentas Internas de Ponce se le describe como el "principal comprador de sellos de rentas internas" semanalmente. Comparecencia especial del querellado, pág. 21. En cuanto a la reinspección de su obra notarial, sostiene que de ella se desprende que:

1. De la suma envuelta —alrededor de $50,000 que señaló el Inspector de Protocolos, o $41,756.58 [13] que señaló el Director,

---

[13] La deficiencia en sellos señalada por el Director en su Informe de 15 de febrero de 1989 asciende a cincuenta y dos mil trece dólares con ocho centavos ($52,013.08) que se desglosan en veinticuatro mil seiscientos diez dólares con veinticinco centavos ($24,610.25) en deficiencias subsanadas y veintisiete mil cuatrocientos dos dólares con ochenta y tres centavos ($27,402.83) correspondientes a la divergencia de criterios por créditos adicionales no exentos.

más de la mitad corresponde a la divergencia de criterios pendiente de adjudicación en el Tribunal Superior, Sala de Ponce.

2. De la restante suma de alrededor de $24,000 según el Inspector, $20,000 según el Director, el notario canceló alrededor de $12,000 antes de que el Tribunal Supremo interviniera en el asunto. Esto lo hizo en aquellas ocasiones en que era detectable que el fundamento del señalamiento del Inspector no era la divergencia de criterio sobre el crédito adicional. Esa tarea fue muy difícil porque el notario, según admite el propio Inspector, nunca tuvo el beneficio de la discusión de los hallazgos. También fue particularmente difícil ya que el Inspector no distinguió entre sellos que faltaban por razón de la divergencia y los que faltaban por otras razones.

3. Durante la reinspección el notario canceló otra suma alrededor de $12,000. La mayor parte corresponde al protocolo de 1987, (14) que no había sido inspeccionado antes. Otra parte importante de esta suma —$2,999.00— corresponde a una escritura que está realmente exenta porque es a favor de la Farmers Home Administration. Otra suma —$2,169— corresponde a ocho escrituras de arrendamiento en las que el notario había cancelado sellos por el máximo de doce años. El notario siguió el mismo criterio del pago de aranceles del Registro de la Propiedad ....

4. En su intervención el Lcdo. Jorge Yordán, señaló que el notario debió cancelar y no canceló la suma de $1,999.00 en la escritura 472 del año 1983. El notario ha creído que esos sellos fueron cancelados durante el curso de la reinspección y así lo hemos informado al Tribunal Supremo en comparecencias anteriores. Véase Anejo E de la Comparecencia para Mostrar Causa. En una copia simple que obtuvimos de dicha escritura no se refleja cancelación alguna. No obstante, en su informe al Tribunal Supremo de 15 de febrero de 1989, el Director de Inspección de Protocolos notificó que todas las deficiencias estaban corregidas. Es evidente que en la reinspección quedó claramente establecido que dicha escritura, como intimaba el propio Lcdo. Yordán, estaba exenta .... De hecho, el Registrador había aceptado e inscribió la copia certificada sin derechos. Véase Anejo C 6 p. 152.

5. La suma restante, que puede fluctuar entre $3,000 y $6,000 representa una ínfima porción de la totalidad de sellos cancelados, que debe ser de alrededor de $500,00[0] que ya es-

---

(14) Según el informe del Director la cantidad en sellos subsanadas correspondiente al protocolo de 1987 fue de cuatro mil setecientos ochenta y ocho dólares con cincuenta centavos ($4,788.50).

taba cancelada. Obsérvese que el notario canceló sellos por algunas deficiencias que detectó el Director que no fueron advertidos por el Lcdo. Yordán. También pagó las deficiencias que el Director de Inspección de Notarías encontró en su protocolo de 1987, que fue inspeccionado por primera vez luego de la intervención del Tribunal Supremo.

6. El notario tenía una reserva de sellos de rentas internas con un valor de alrededor de $50,000 en el momento en que se produjo la intervención del Tribunal Supremo. Así surge del Mandamiento diligenciado por el señor Alguacil que hizo la incautación; documento que aparece unido al expediente original. Su costumbre es comprar sumas significativas de sellos en intervalos breves y conservar una buena cantidad en reserva.

7. Los sellos que el notario canceló luego de la inspección y durante la reinspección corresponden sustancialmente a casos de escrituras que incluían más de una transacción. En [é]stas sus secretarias y empleados hicieron cómputos sobre la base de una de las transacciones. (Escolio omitido.)

Por otro lado, en su comparecencia el notario enfatiza que las deficiencias en sellos encontradas por el Inspector Yordán no responden a un plan preconcebido de parte suya para aprovechar recursos del Estado. Alega que para que se configure el delito de apropiación ilegal tiene que probarse la intención específica de apropiarse de los bienes y la transferencia o el desplazamiento de la propiedad mueble de un patrimonio a otro. Pero las circunstancias de este caso no presentan "ni la más mínima posibilidad de que se constituyera el delito" (Comparecencia especial del querellado, pág. 26) puesto que la suma de las deficiencias es sólo una fracción de los sellos cancelados por el notario durante el período de inspección y *se debe a errores de cómputos e inadvertencias típicas de la práctica notarial, así como a la divergencia de criterio en cuanto al crédito adicional garantizado con hipotecas.* Además, la práctica de compra semanal y posesión del notario de sumas sustanciales de sellos de rentas internas, así como la reserva significativa de sellos en su oficina, arrojan un balance positivo a favor del Estado y milita contra la teoría de que el notario se apropió del dinero para pagar esos sellos.

En cuanto a las otras deficiencias encontradas en la reinspección, que no se refieren a la cancelación de sellos de rentas internas, el notario aduce que:

Algunas de estas deficiencias son *lamentables imperfecciones, que según los propios Inspectores de Protocolos, aparecen normalmente en las inspecciones notariales.* Estas se corrigen mediante la comunicación entre el Inspector y el notario. En esa categoría está la falta de algunas firmas y de iniciales, y la ausencia de algunas notas de saca y de apertura o cierre. En otros casos, los señalamientos se refieren a *asuntos discutibles,* como por ejemplo, que haya iniciales sólo en una de las caras de las páginas de las escrituras de hipotecas usualmente preparadas en formularios, y la alegada falta de claridad en el estado civil en escrituras en que ... no se dice que están casados entre sí. Otra —la falta de encuadernación del protocolo de 1987— es consecuencia de *una dificultad práctica debido a que en el área [s]ur sólo existe un encuadernador.* Para éste, encuadernar un protocolo de alrededor de mil escrituras representa un descalabro en el calendario, que puede resolver posponiéndolo para el final. (Énfasis suplido.) Comparecencia especial del querellado, pág. 27.

*Finalmente, el notario Colón Muñoz señala que las deficiencias fueron detectadas y corregidas en tres (3) etapas distintas, a saber: (1) durante la inspección del Inspector Yordán, las que fueron corregidas en la primera oportunidad; (2) durante la incautación ordenada por este Tribunal, como por ejemplo la falta de encuadernación del protocolo de 1987, que se debe a la indisponibilidad del único encuadernador reconocido en el área sur, y (3) en la reinspección ordenada por este Foro al Director, las cuales el notario mostró interés en subsanar tan pronto fue advertido de ellas.*

Culmina su escrito el notario Colón Muñoz afirmando que durante todo el proceso actuó con premura y con un alto sentido de responsabilidad frente a los requerimientos del Director y del Inspector Yordán y que si hubo dificultades en las etapas del proceso fueron debidas a la "tormenta de confusión" de éste como consecuencia de factores objeti-

vos (como la acumulación de seis (6) años sin que se hubiese practicado una inspección de su obra notarial); el tamaño poco frecuente de dicha obra; la coincidencia de divergencias de criterio reales con otras deficiencias "sobre las que no hay controversia" (Comparecencia especial del querellado, pág. 31); la limitación de recursos de la Oficina de Inspección de Notarías, y el hecho de que, en su caso, el Inspector Yordán no siguiera el procedimiento y la práctica normal seguido por otros inspectores de notificarle las deficiencias al notario y darle la oportunidad de corregirlas antes de rendir su informe al Director.

Como súplica de su escrito nos pidió que ordenáramos el archivo de la causa seguida en su contra y que, de no acceder a ese pedido, le concediéramos una vista oral argumentativa ante el Pleno del Tribunal.

El 24 de enero de 1990 el licenciado Colón Muñoz presentó una "Moción suplementaria a la comparecencia especial" que acompañó con la sentencia dictada por el Tribunal Superior, Sala de Ponce, en el caso instado por el Director en torno a la controversia sobre la cancelación de sellos por los créditos adicionales garantizados por hipotecas el 22 de enero de 1990. La sentencia resuelve que la intención legislativa no era imponer tributos por estos créditos, por lo que no debían adicionarse éstos al principal del crédito hipotecario a fines de computar la cantidad de sellos de rentas internas que serían cancelados en las escrituras principales y copias certificadas de las hipotecas. Resolvió así la divergencia de criterios a favor del notario Colón Muñoz.

En su escrito suplementario el notario Colón Muñoz nos solicita que prestemos especial atención a ciertas determinaciones de hecho de dicha sentencia "que son fundamentales para la evaluación del asunto pendiente" ante este Tribunal. Determinaciones de hecho 3, 4, 5, 6, 7.8 y 9 de la sentencia. Éstas se refieren al proceso de inspección del Inspector Yordán de la obra notarial del licenciado Colón Muñoz.

El 22 de febrero de 1990 nos dimos por enterado de varios escritos, dimos por sometida la comparecencia suplementaria y denegamos la vista oral argumentativa.([15])

El *6 de marzo de 1990* el licenciado Colón Muñoz presentó una moción de reconsideración a nuestra negativa de conceder una vista oral, la cual fue denegada el *15 de marzo del mismo año.*

De los escritos presentados por las partes surgen diversos planteamientos que debemos atender. Veamos.

II

A. *Análisis doctrinario*

Una vez más reafirmamos la transcendencia de la función del notario de tipo latino en la esfera privada y profesional hasta remontarse *a una función pública que requiere suma diligencia y celo profesional de quien la ejerce en Puerto Rico. In re Cruz Ramos,* 127 D.P.R. 1005 (1991). La amplitud o lo limitado de la práctica de un notario no debe incidir con la cautela, el esfuerzo, tesón y cuidado con que se debe ejercer y con el cabal cumplimiento de las obligaciones y los deberes que le imponen al notario la ley y los cánones de ética profesional. *In re Bringas Rechani,* 128 D.P.R. 132 (1991). *Siempre el incumplimiento con una de estas fuentes de obligaciones y deberes ha expuesto al notario a la acción disciplinaria correspondiente. In re Rodríguez Mena,* 126 D.P.R. 205 (1990).

En *In re Feliciano,* 115 D.P.R. 172, 175 (1984), ci-

---

([15]) El 16 de enero de 1990 el Director nos remitió un informe que contenía deficiencias sobre las cuales no había divergencia de criterio al inspeccionarse el protocolo de 1988 que consta de diecisiete (17) tomos debidamente encuadernados. Dichas faltas fueron subsanadas por el notario tan pronto se enteró de que se había terminado el examen de dicho protocolo.

tando a *In re Lavastida et al.*, 109 D.P.R. 45, 97 (1979), describimos así la dualidad de funciones del notario:

> El notario es un "profesional" en toda la extensión de la palabra. *Pueblo v. Central Cambalache*, 62 D.P.R. 553, 561 (1943). "[P]or su condición de abogado, se funden dos facetas esenciales en la administración de la justicia. La primera, la que surge como profesional del derecho, preparado académica e intelectualmente para las lides forenses y comparecencias ante foros adjudicativos. Como tal está versado en la técnica jurídica y capacitado para dar consejos y servir de guía a todo interesado, no sólo en este rol, sino en el de notario. En su segunda faceta, la de notario es, *funcionario público investido de autoridad y con capacidad autenticadora y legalizadora en el plano de las relaciones privadas, imponiendo a los actos que ve y oye —visus et audit— una eficacia autenticadora cubierta con una presunción de veracidad, producto neto que parte del supuesto de un leal acatamiento de los requisitos y formalidades de ejercer con fidelidad su encomienda.*" (Énfasis en el original suprimido y énfasis suplido.)

En su función pública el notario debe ser consciente de que *los protocolos pertenecen al Estado*, siendo el notario un mero custodio de éstos por delegación de aquél. *In re Baigés Chapel*, 104 D.P.R. 638 (1976); *Inspector de Protocolos v. Dubón*, 107 D.P.R. 50 (1978).

Por ello, *notificadas las deficiencias por el Inspector de Protocolos, corresponde al notario corregirlas con suma diligencia.* La ausencia de corrección combinada con la gravedad de tales deficiencias permiten a este Foro hacer valer nuestra facultad disciplinaria sobre los notarios y nuestra revisión sobre su función pública.

Por otro lado, *nunca la tardanza en la inspección de protocolos ha sido excusa para que el notario incurra en serias, continuas y repetidas deficiencias en su obra notarial. Si ello fuera así dejaríamos a la contingencia de dichas inspecciones la eficacia y validez jurídicas de los documentos que ante el notario se otorgan.* Las obligaciones del notario surgen, entre otras, de la ley que él conoce y a

la cual debe dar cumplimiento. La función de inspección de protocolos es una de supervisión de que se ha dado cumplimiento a la ley. *El notario no puede esperar a que se le inspeccione su protocolo para dar cumplimiento a la ley que regula su ministerio. El notario tiene que cumplir la ley en cada acto en que actúa como tal.* El notario es el profesional del Derecho que con su sapiencia y experiencia, o mediante la consulta bonafide frente a lo nuevo, o que frente a la discrepancia busca la solución correcta y legal; es quien, en fin, da forma legal y presunción de verdad a los actos en que interviene.

Carece de fundamentos lo alegado por el notario aquí querellado en el sentido de que nunca fue notificado de las faltas antes de que el Inspector Yordán remitiera su informe al Director. Expresamente el Inspector Yordán expresó en su informe que le estaba remitiendo copia al licenciado Colón Muñoz. Se activa, pues, la presunción de la ley de que una comunicación enviada llegó a su destino. Regla 16 (24) de Evidencia, 32 L.P.R.A. Ap. IV; *Soto v. Caribe Shipping Co., Inc.*, 128 D.P.R. 385 (1991); *Hawayek v. A.F.F.*, 123 D.P.R. 526 (1989). La evidencia aducida *por el licenciado Colón Muñoz resulta insuficiente para rebatir esa presunción. Además, el propio notario acepta que el Inspector Yordán dejaba con su secretaria las hojas de trabajo en las cuales tal inspector señalaba las deficiencias encontradas en la obra notarial inspeccionada.*

Finalmente, el notario Colón Muñoz tuvo la oportunidad y estuvo presente durante la reinspección. De manera que *en todo momento fue notificado de las deficiencias y en concepto de qué eran éstas.*

Por otro lado, surge patentemente claro que las deficiencias en la obra notarial del licenciado Muñoz Colón no se deben "esencialmente" a una divergencia de criterio; como éste adujo desde el inicio de nuestra intervención. Según se desprende del informe inicial y de la reinspección rendido por el licenciado Martínez Surís las mismas son de variada

índole, naturaleza y gravedad. *Con relación a la deficiencia en sellos de rentas internas cabe señalar que cerca de veinticuatro mil seiscientos diez dólares con veinticinco centavos ($24,610.25) que faltaban en dichos sellos no caen dentro de la controversia sobre el crédito adicional no exento.* Se notará que tal deficiencia sustancial y grave, aún tratándose de una gestión notarial intensa como la del licenciado Colón Muñoz, *requería urgente atención.*

Lo anterior nos lleva a considerar en detalle las deficiencias encontradas en la obra notarial del licenciado Colón Muñoz.

## III

A. *Evaluación de los hechos y de los planteamientos ante nos*

No existe controversia en cuanto a que *durante la reinspección de la obra notarial* del licenciado Colón Muñoz para el período en controversia, éste corrigió las faltas y deficiencias, tanto de sellos sin cancelar así como en cuanto a la firma, las iniciales, el estado civil de varios otorgantes, el sello e impuesto notarial, que le habían sido señaladas informalmente por el Inspector Yordán en el examen original y notificado en el informe por escrito de 29 de noviembre de 1988. *Sin embargo, esas faltas y deficiencias subsistían hasta el momento de la reinspección y eran de variada índole y de naturaleza grave.* Examinemos cada deficiencia en detalle, así como la postura del notario frente a éstas.

1. *Deficiencias en sellos*

Conforme al informe del Director de 15 de febrero de 1989, la reinspección reflejó que para el período comprendido entre 1981 y 1987 existían sesenta (60) escrituras que no tenían sello alguno. Había nueve (9) escrituras de hipotecas, para 1984 y 1986, que tampoco tenían ningún sello.

Sobre éstas no existía divergencia de criterio alguna. Las deficiencias en sellos para el período en cuestión ascendían a veinticuatro mil seiscientos diez dólares con veinticinco centavos ($24, 610.25). Estas deficiencias en sellos se habían señalado en el informe pormenorizado del Inspector Yordán y fueron corregidas por el licenciado Colón Muñoz durante el proceso de reinspección al permitirle el Director ir adhiriendo y cancelando en las escrituras matrices los derechos por deficiencias de tales sellos.

No obstante, es importante destacar que tales deficiencias, aun siendo obvias, subsistieron por seis (6) años sin ser corregidas por el notario.

La cancelación que de dichos sellos hizo el notario durante la reinspección de su obra *notarial es tácita aceptación de que incumplió con su deber de adherir y cancelar los referidos sellos de rentas internas, sobre los que no existían divergencia de criterio, en los instrumentos públicos autorizados por él al momento del otorgamiento.* Adviértase que en esos casos no se trata de insuficiencia de sellos adheridos de acuerdo con el criterio del Inspector Yordán o del Director. *Se trata de ausencia total de sellos en esos documentos.*

El dejar de adherir los sellos de rentas internas y cancelarlos *al momento de autorizar* los documentos públicos otorgados ante él es una falta grave. *In re Ramos*, 77 D.P.R. 107 (1954); *In re Currás*, 81 D.P.R. 645 (1960); *In re Aponte Arché*, 117 D.P.R. 837 (1986); *In re Tirado Saltares*, 118 D.P.R. 576 (1987); *In re Jiménez Del Valle*, 119 D.P.R. 41 (1987); *In re Jaime Collazo*, 119 D.P.R. 60 (1987); *In re Vergne Torres*, 121 D.P.R. 500 (1988); *In re Figueroa Abreu*, 124 D.P.R. 810 (1989).

Desde *In re Platón*, 113 D.P.R. 273, 274 (1982), hemos señalado que "se defrauda al erario cuando se persiste obstinadamente en no adherir a las escrituras los sellos de rentas internas que ordena el arancel notarial".

154

Véase, además, *In re Quidgley Viera*, 119 D.P.R. 72 (1987). Ello es así ya que la ley (Ley Núm. 101 de 12 de mayo de 1943 (4 L.P.R.A. sec. 851 *et seq.*)) en conjunción con la Ley Notarial de Puerto Rico de 1957, Ley Núm. 99 de 27 de junio de 1956 (4 L.P.R.A. ant. sec. 1001 *et seq.*) dispone para el cobro de derechos en los instrumentos públicos a través de sellos de rentas internas a favor del Estado y del Colegio de Abogados. 4 L.P.R.A. sec. 851 y ant. sec. 1006. La Ley Notarial de Puerto Rico de 1959, vigente y aplicable a este caso, específicamente establecía que "[s]erá *deber* de todo notario adherir y cancelar en cada escritura original que otorgare y en las copias que de ellas se expidieren los correspondientes sellos de rentes internas ...". (Énfasis suplido.) 4 L.P.R.A. ant. sec. 1006. Véase *In re Feliciano*, supra.

*Conforme a nuestra doctrina sobre el pago de dicho arancel, todo derecho de arancel o de otra índole que conforme a la ley devengue el instrumento público, tanto en el original como en sus copias certificadas, será sufragado por los interesados a tenor con lo dispuesto en el Derecho vigente o con los acuerdos al respecto habidos entre éstos.*

*El notario podrá rehusar autorizar el instrumento a menos que se hubiese provisto para el pago de los derechos arancelarios a su satisfacción. Cf.* Ley Núm. 101 de 12 de mayo de 1943, según enmendada por la Ley Núm. 5 de 12 de agosto de 1984 (4 L.P.R.A. sec. 851); Arts. 10, 61, 77 y 78 de la Ley Notarial de Puerto Rico, Ley Núm. 75 de 2 de julio de 1987 (4 L.P.R.A. secs. 2021, 2101, 2131 y 2139); *In re Platón*, supra; *In re Feliciano*, supra; *In re Merino Quiñones*, 115 D.P.R. 812 (1984); *Mojica Sandoz v. Bayamón Federal Savs.*, 117 D.P.R. 110 (1986); *In re Tirado Saltares*, supra; *In re Vergne Torres*, supra; *In re Ralat Pérez*, 124 D.P.R. 745 (1990); *In re Flores Torres*, 125 D.P.R. 159 (1990); *In re Duprey Maese*, 125 D.P.R. 336 (1990).

Si el notario autoriza el instrumento público, como el

caso ante nos, es porque los interesados han provisto para el pago de los derechos arancelarios a su satisfacción. Bajo dichas circunstancias es, entonces, responsabilidad ineludible e inexcusable del notario adherir y cancelar los sellos correspondientes.

El notario que no adhiera y cancele las correspondientes estampillas exigidas por ley, al momento de autorizar o certificar un instrumento público, está sujeto a sanciones y acciones disciplinarias sin menoscabo de su responsabilidad legal. *In re Feliciano Betancourt*, supra.

En *In re Merino Quiñones*, supra, págs. 813–814, expresamos que:

> La práctica de algunos abogados-notarios de no cancelar los correspondientes sellos de rentas internas *inmediatamente* que otorgan una escritura no sólo constituye una violación a la Ley Notarial de Puerto Rico, sino que podría inclusive resultar en la configuración de un delito de apropiación ilegal, por cuanto el importe de dichos sellos es por lo general cobrado por el notario a su cliente al momento de la otorgación del instrumento con el propósito expreso y específico de la compra y cancelación de los referidos sellos. Cuando menos, constituye una práctica altamente censurable que no debe ser continuada, que no estamos dispuestos a tolerar, y que puede constituir, por sí sola, causa suficiente para la separación de un abogado del ejercicio de la notaría en Puerto Rico. (Énfasis suplido y escolios omitidos.)

Ya en *In re Platón*, supra, dejamos claramente establecido que la obligación de cancelar sellos en los instrumentos públicos es de estricto cumplimiento. En *In re Feliciano*, supra, ratificamos que su incumplimiento exponía al notario a graves sanciones correctivas, incluso la separación del ejercicio de la profesión de abogado, ya que su responsabilidad por omitir cancelar los sellos es una de *naturaleza continua*. Véanse, además: *In re Aponte Arché*, supra; *In re Tirado Saltares*, supra; *In re Jiménez Del Valle*, supra; *In re Flores Torres*, supra; *In re Cruz Ramos*, 127 D.P.R. 1005 (1991).

Además, la falta de adherir y cancelar los sellos de rentas internas en las escrituras o sus copias certificadas las expone a la anulabilidad e ineficacia jurídica en perjuicio de otorgantes o terceros. Al respecto, en *Mojica Sandoz v. Bayamón Federal Savs.*, supra, señalamos que una escritura a la que le falten los sellos requeridos por la Ley Notarial de Puerto Rico de 1954 es anulable en el caso extremo en que el importe de los sellos no pueda recuperarse de las partes o del notario y sus sustitutos o causahabientes. Ello, sin perjuicio de la imposición de medidas disciplinarias contra el notario. En *In re Ralat Pérez*, supra, pág. 747, advertimos los efectos funestos que tal práctica tiene para los intereses privados y la sociedad en general. Allí dijimos:

> Procede enfatizarse el hecho de que el incumplimento por el notario con la obligación de cancelar los sellos correspondientes en las escrituras que otorga puede tener efectos funestos para la sociedad en que éste convive y trabaja. *Hasta tanto dichos sellos sean adheridos y cancelados, la validez de dichas escrituras, o de las copias certificadas, está en entredicho, pues las mismas son anulables e ineficaces.* Véase, además, *In re Flores Torres*, supra.

*La corrección inmediata* de tal deficiencia, adhiriendo los sellos requeridos por la ley *tan pronto el notario es apercibido, es un atenuante* a la sanción disciplinaria que se le impone. *In re Jiménez Del Valle*, supra, pág. 43 (en reconsideración). *Pero la corrección o subsanación posterior de esa deficiencia no impide que impongamos la sanción disciplinaria correspondiente. In re Flores Torres*, supra.

En su comparecencia para mostrar causa, el licenciado Colón Muñoz aduce que las deficiencias en sellos, por razones distintas a la divergencia de criterio, son "errores de cómputo cometidos de buena fé" y que normalmente ocurren en la práctica notarial. Tal justificación no encuentra apoyo en los hechos. De acuerdo con el informe, aparte de

ciertas escrituras en las que existe discrepancia en el cómputo de sellos entre notario e inspector, *existen más de sesenta (60) escrituras sin sello alguno. No era, pues, cuestión de "cómputo".*

Nos preocupa que el notario califique estas deficiencias de *"importancia menor"* cuando consistentemente hemos resuelto que tales deficiencias son de naturaleza grave. *In re Jiménez Del Valle*, supra.

*Coincidimos con el notario*, sin embargo, en que *no existe prueba en autos de que éste se aprovechó o apropió de cantidad alguna pagada por los otorgantes en concepto de esos sellos. Cf. In re Platón*, supra. El hecho de que el notario contara en su oficina con sellos suficientes para cubrir las deficiencias al momento de que ordenáramos la incautación de sus protocolos, unido al hecho de que corrigió las deficiencias, apoyan esa conclusión.

*Reconocemos, además, que con posterioridad a nuestra orden, en todo momento el licenciado Colón Muñoz expresó interés en adherir y cancelar en las escrituras matrices aquellas deficiencias en sellos que no fueran objeto de la divergencia de criterio en cuanto a los créditos adicionales garantizados en las escrituras de hipoteca.*

*Por otro lado es atenuante el hecho de que no surja de la prueba que los otorgantes o terceros hayan sufrido algún perjuicio. In re Ardín*, 75 D.P.R. 496 (1953). Sin embargo, ese hecho no exime de responsabilidad al notario. Flaco servicio daría este Foro a nuestro Pueblo si tuviéramos que esperar a que un otorgante o un tercero sufriera daño para ejercer nuestra función disciplinaria y correctora de la práctica notarial. Al igual que es profiláctica la sanción disciplinaria al notario o abogado, es preventiva la función revisora del ejercicio de la práctica notarial que este Foro ha delegado en la Oficina de Inspección de Notarías adscrita a este cuerpo. La corrección temprana de la falta y la sanción procedente al notario, conforme a la gravedad de tal falta y la actitud del notario ante el proceso, es garantía

plena a quien, fiado en la pureza de la gestión del notario, comparece ante éste para dar forma legal y revestir de presunción de verdad a sus negocios.

2. *Falta de firma o iniciales de otorgantes y/o testigos*

Conforme al informe del Director, en la obra notarial del licenciado Colón Muñoz —para el período en cuestión— existían cincuenta y una (51) escrituras en que faltaban las firmas de los otorgantes y/o testigos. Había, además, veintinueve (29) escrituras sin iniciales.

De conformidad con la Sec. 20 de la Ley Notarial de Puerto Rico de 1957 aquí aplicable, 4 L.P.R.A. ant. sec. 1020

Serán *nulos* los instrumentos públicos:

. . . . . . . .

(3) *En que no aparezcan las firmas de las partes*, cuando deban hacerlo ... y, en los casos previstos por las secs. 1014, 1016 y 1027 de este título, *las firmas de los testigos*. (Énfasis suplido.) Véase, además, *Sucn. Santos v. Registrador*, 108 D.P.R. 831, 837 (1979).

 De igual manera que no cancelar los sellos, la ausencia de la firma y las iniciales de los otorgantes es una deficiencia grave. Al respecto, señalamos en *In re Platón*, supra, pág. 274:

La omisión de tomar *la firma e iniciales* de los otorgantes es, por otra parte, causa de nulidad del instrumento, que *implica a su vez una violación de la fe pública de que están investidos los notarios*. (Énfasis suplido.)

Igual norma aplica a la ausencia de firmas e iniciales de los testigos en el instrumento, *cuando así lo requiere la ley*. 4 L.P.R.A. ant. sec. 1020.

No nos satisface la explicación del notario en cuanto a esta deficiencia. El hecho de que este tipo de deficiencia alegadamente aparezca "normalmente en las inspecciones notariales" no justifica que el notario incurra en ellas. Ade-

más, aquí se trata de ochenta (80) escrituras con esa deficiencia.

Por otro lado, el hecho de que fueran corregidas no rebate el hecho de que por su omisión se afectó la validez de esos documentos por un período de seis (6) años.

Sostiene, además, el notario que la deficiencia en cuanto a las firmas e iniciales

> ... eran mayormente de los representantes del acreedor hipotecario en escrituras de constitución de hipoteca, motivadas por la relación de trabajo y la proximidad física del notario con el acreedor hipotecario. Los representantes de éste entran y salen constantemente de la oficina del compareciente, siendo interrumpidos en numerosas ocasiones durante el curso del otorgamiento de las escrituras.
>
> En otros casos, la omisión de iniciales se refiere a una página específica en escrituras de más de veinticuatro folios. En muchos de éstos, las iniciales aparecían en una de las caras del folio aunque no en el otro, lo que es argumentablemente suficiente, siendo la costumbre de muchos en los casos de escrituras cuyos folios aparecen escritos en ambas caras tomar las iniciales de los otorgantes en una sola de las caras. Comparecencia para mostrar causa y solicitando continuación de los procedimientos, pág. 15.

Pero, precisamente para protección de quienes ante él comparecen *es que la ley* le exige al notario que se asegure de tomar firmas al final e iniciales en cada folio de la escritura sin que la estrecha relación con dichas personas o su proximidad física interfieran con el descargo de su deber.

## 3. *Estado civil de los otorgantes*

Conforme al referido informe del Director, existían treinta y tres (33) escrituras en las cuales no estaba claro o no se indicó el estado civil de los otorgantes.

La Ley Notarial de Puerto Rico de 1957 dispone que el notario debe dar fe en los instrumentos públicos del estado civil de los otorgantes y "en caso de que fuera ca-

sada la persona que aparezca como adquirente del derecho que es objeto del contrato, se expresará el nombre y apellido del cónyuge que no comparezca al otorgamiento. En casos graves y extraordinarios en que no sea posible consignar por completo estas circunstancias, expresarán cuanto sobre ello les conste de propia ciencia y manifiesten los testigos". 4 L.P.R.A. ant. sec. 1016.

Este es un requisito sustantivo que se impone en protección de los otorgantes. Su incumplimiento denota negligencia crasa en el ejercicio del notariado. *Cf. In re Cruz Disdier*, 70 D.P.R., 453, 457 (1949). Además, defrauda la fe pública que da el notario de haberse cerciorado, por los medios a su alcance, del estado civil de los otorgantes. *Cf. In re Cancio Sifre*, 106 D.P.R. 386 (1977).

■ Adviértase que el incumplimiento de dar fe del estado civil de los otorgantes puede ocasionar dificultades de acceso de tales documentos en el Registro de la Propiedad. El Art. 99.2 (7ma) del Reglamento General para la Ejecución de la Ley Hipotecaria y del Registro de la Propiedad, 30 L.P.R.A. sec. 2003–99.2 (7ma), edición especial, exige que se determine las personas de quienes proceden los bienes o derechos a favor de quien se inscriban " 'expresando su nombre y demás circunstancias personales, con especificación cuando se trate de personas casadas, de los nombres y apellidos de ambos cónyuges' ". *Cf. Rosado Collazo v. Registrador*, 118 D.P.R. 577, 584 (1987). Aunque aquí no existe prueba de dificultad de acceso registral de los documentos en cuestión, no deja de ser un incumplimiento del notario la falta de especificar el estado civil de los otorgantes en las referidas treinta y tres (33) escrituras.

No nos convence la justificación del notario de que la cuestión es "discutible". *La obligación legal está clara.*

### 4. *Falta de sello del notario*

Había un total de cincuenta y tres (53) escrituras, según el informe, a las que les faltaba el sello del notario.

■ Conforme a la Ley Notarial de Puerto Rico de 1957 es deber del notario estampar su sello en todos los folios de las escrituras originales y sus copias certificadas. 4 L.P.R.A. ants. secs. 1009 y 1024. La finalidad de dicho sello es "darle o robustecer la solemnidad externa" de los documentos notarizados. Véase P. Malavet Vega, *Compendio de Derecho Notarial puertorriqueño*, mimeografiado, Ponce, 1987, pág. 65. El dejar de estampar dicho sello arroja dudas sobre la integridad formal del documento y sobre su validez jurídica.

El notario no ha justificado tal deficiencia. Lo que denota que se debió a negligencia inexcusable.

### 5. *Falta de la firma del notario*

Otra de las deficiencias señaladas por el Informe de 15 de febrero de 1989 fue la ausencia de la firma del notario en siete (7) escrituras.

■ La ausencia de firma del notario hace nulo el instrumento. 4 L.P.R.A. ant. sec. 1020; *Fragoso v. Marxuach*, 31 D.P.R. 195 (1922). Ello, en perjuicio de otorgantes y terceros. El notario no nos ha explicado o justificado a satisfacción esta deficiencia. Debemos presumir que se debió a su falta de cuidado o negligencia y no a mera inadvertencia como él sostiene.

### 6. *Falta de la nota de saca*

■ Cuando el notario expide copia certificada de una escritura matriz de su protocolo debe hacer constar tal hecho al margen del original en una nota que *él firma* y donde consigna el nombre de la persona a quien se le haya

librado, la fecha y el número que corresponda a tal copia conforme a las expedidas. 4 L.P.R.A. ant. sec. 1025. El valor de la nota de saca es *probatorio*. Art. 1175 del Código Civil, 31 L.P.R.A. sec. 3276.

La ausencia de algunos de los requisitos de la nota de saca en el original pone en entredicho la admisibilidad en evidencia de tales copias certificadas. *Cf.* 4 L.P.R.A. ant. sec. 1025. Ello perjudica a los otorgantes y terceros que puedan haber pagado los correspondientes derechos para obtener esas copias certificadas.

Conforme al informe del Director, existían en los protocolos del licenciado Colón Muñoz sesenta y seis (66) escrituras a las cuales les faltaba la firma del notario en la nota de saca para el período bajo inspección.

El notario aduce que esta es una "lamentable imperfección" que normalmente aparece en las inspecciones notariales. No nos convence su justificación para su tan frecuente imperfección en las notas de saca.

7. *Ausencia de firma y sello en la nota de apertura del protocolo*

Tres (3) tomos del protocolo para 1981 del licenciado Colón Muñoz no tenían la firma ni el sello del notario en la nota de apertura.

La importancia de esa nota es palmaria. Con ella se identifica el inciso de un protocolo con especificación de la fecha exacta. No nos satisface la explicación dada por el notario en su comparecencia en cuanto a esta deficiencia en su obra notarial.

8. *Ausencia de firma y sello del notario en la nota de cierre del protocolo*

La Ley Notarial de Puerto Rico de 1957 exige, en lo pertinente, que:

Del mismo modo se cerrará cada protocolo en el último día de cada año natural, autorizando el notario la siguiente nota, a continuación del último instrumento protocolado:

Concluye el protocolo del año de ... que contiene (tantos) instrumentos públicos y (tantos) folios autorizados por mí, el infrascrito notario, de lo que certifico.

Estas notas irán *firmadas*, signadas, rubricadas, selladas y fechadas .... (Énfasis suplido.) 4 L.P.R.A. sec. 1030.

▊ Como señala la ley, el protocolo se cierra al último día del año natural con esta nota que da certeza sobre la culminación del protocolo (o del tomo) del notario para ese año (o período del año cubierto por el tomo correspondiente).

De acuerdo con el informe del licenciado Martínez Surís había tres (3) escrituras en los años 1981 y 1986 en que faltaba la firma y el sello del licenciado Colón Muñoz en la nota de cierre del protocolo. Tampoco nos satisface la contención del notario de que ésta es, al igual que las deficiencias en las notas de apertura, una imperfección normal que surge en las inspecciones de notaría. Con simplemente poner mayor celo y cuidado se evitan esas deficiencias.

## 9. *Falta de encuadernación del protocolo de 1987*

El notario justifica esta deficiencia aduciendo una dificultad práctica debida a la existencia de un solo encuadernador de protocolos en el área sur. Añade que "para éste encuadernar un protocolo de alrededor de mil escrituras representa un descalabro en el calendario, que puede resolver posponiéndolo para el final".

Esta contención del licenciado Colón Muñoz fue avalada con una declaración jurada del Sr. Florencio Rodríguez encuadernador del área sur.

Según nos comunicara el licenciado Martínez Surís, los protocolos correspondientes a 1987 del licenciado Colón Muñoz debieron quedar encuadernados para el 1ro de marzo de 1988 conforme a la Ley Notarial de Puerto Rico.

Cuando fueron incautados, el 27 de enero de 1989, no lo estaban. *De suerte que, había transcurrido un término de diez (10) meses en exceso del término dispuesto en la Ley Notarial de Puerto Rico* para que el licenciado Colón Muñoz encuadernara dichos protocolos, sin que se le diera cumplimiento a esa exigencia de ley.

▮ La encuadernación de los protocolos es una medida de asegurar y proteger la integridad física de los documentos públicos que conforman la obra notarial. *Cf. Ex parte González Ramírez*, 100 D.P.R. 1103 (1971). Bajo la ley aplicable a este protocolo de 1987 —Ley Núm. 75 de 2 de julio de 1987 (4 L.P.R.A. sec. 2001 *et seq.*)— el notario tenía dos (2) meses al empezar dicho año para encuadernar el protocolo, esto es, hasta el 1ro de marzo de 1987. 4 L.P.R.A. sec. 2076. Pero como señala Don Pedro Malavet Vega:

> Esto siempre plantea un problema para el notario, puesto que los documentos no pueden retirarse de la oficina notarial, a no ser por decreto judicial, o por autorización de la Oficina de Inspección de Notarías. Por ello, si es preciso sacarlos de la oficina para la encuadernación, debe obtenerse previamente ese permiso. *Los encuadernadores no son siempre fáciles de conseguir.* Algunos trasladan sus equipos a las oficinas notariales, especialmente cuando se trata de protocolos voluminosos. (Escolio omitido y énfasis suplido.) P. Malavet Vega, *Compendio de Derecho Notarial Puertorriqueño*, págs. 83–84.

Si bien es cierto que aquí existe prueba que podría atenuar la violación de la ley en cuanto a la no encuadernación del Protocolo de 1987 dentro del término, nos resulta difícil condonar que el notario dejara transcurrir un término irrazonable de diez (10) meses en exceso al término legal sin encuadernar dicho Protocolo. La declaración jurada del encuadernador es insuficiente para justificar tan excesivo período de tiempo. Recuérdese que mientras no se encuaderna el Protocolo el notario incumple con su deber de protegerlo debidamente. Adviértase, además, que

cuando fueron incautados por el Alguacil General de este Tribunal el 27 de enero de 1989, no estaban encuadernados y no surge de la declaración jurada del encuadernador que esa tarea estuviera en su calendario próximo. Fue el 14 de junio de 1989 cuando finalmente dicho protocolo de 1987 quedó encuadernado.

### 10. *Escritura con guarismo*

Conforme el informe del Director, en 1981 había una (1) escritura en que el día del otorgamiento se indicó en guarismos (números).

██ Contrario a los libros del Registro de la Propiedad, 30 L.P.R.A. sec. 2152, en las escrituras no puede usarse guarismos al expresar las fechas o cantidades a menos que se hayan expresado además en letras. 4 L.P.R.A. ant. sec. 1017. Este es un defecto de forma subsanable. *In re Arroyo Rivera*, 63 D.P.R. 796, 798 (1944).

### 11. *Escrituras con folios o espacios en blanco*

██ La Ley Notarial de Puerto Rico de 1957 no permite que en las escrituras aparezcan folios o espacios en blanco sin inutilizar. 4 L.P.R.A. ant. sec. 1017. Permitir ello arrojaría dudas sobre la integridad del documento permitiendo que pueda ser alterado indebidamente y facilitar el que se cometa fraude. *Cf.* 4 L.P.R.A. ant. sec. 1018.

Es ajena a la buena práctica notarial y constituye un grave error dejar no solo espacios sino folios enteros en blanco en una escritura.

De acuerdo con el informe del licenciado Martínez Surís había seis (6) escrituras (de 1981 a 1986) en la obra notarial del licenciado Colón Muñoz con folios y/o espacios en blanco.

Específicamente la Escritura Núm. 295 otorgada en 1986 tenía un folio entero (Núm. 2546) en blanco. Con res-

pecto a las otras cinco (5) escrituras con espacios en blanco, es importante puntualizar que algunos de estos subsisten en las referidas escrituras.

El notario no presentó explicación alguna ante nos para tal deficiencia en su obra notarial.

12. *Falta de expresión de cuantía de pagaré*

Finalmente, el licenciado Martínez Surís hace constar en su informe que en una (1) escritura de cancelación de pagaré de 1987 *no se expresó la cuantía del pagaré cancelado.*

La ausencia de tal cuantía en la escritura de cancelación arroja dudas sobre el documento mismo. Confróntese *Lozada Merced v. Registrador*, 100 D.P.R. 99 (1971).

El notario no ha justificado tal deficiencia en dicha escritura de cancelación de pagaré.

*Resumen*

En síntesis, la inspección y reinspección de la obra notarial del licenciado Colón Muñoz *reflejan una serie de deficiencias de diversa naturaleza y gravedad.* Dicha obra, voluminosa como es, presenta deficiencias que van desde errores de forma elementales hasta errores sustanciales que hacen nulos y/o anulables los instrumentos autorizados por el notario. *Contrario a lo sostenido por el notario, la amplitud de su obra notarial no debe ser excusa para dichos errores, sino que exige de este profesional del Derecho mayor cautela y rigurosidad pues, en última instancia, más son las personas que potencialmente se pueden afectar con tales errores.*

No tenemos dudas que desde el origen el notario Colón Muñoz tenía conocimiento de las deficiencias encontradas por el Inspector Yordán. No creemos que existiera la alegada falta de notificación al notario. Más aún, cualquier

duda al respecto quedó despejada al permitírsele estar presente durante la reinspección.

Tampoco tenemos dudas de que las deficiencias que le fueron señaladas a su obra no se limitaron a la deficiencia en sellos debido a una divergencia de criterio entre notario e inspector. Esa controversia, que fue debidamente remitida y dilucidada ante el foro judicial, es sólo parte de las múltiples deficiencias en su obra notarial.

*Aunque todas las faltas o deficiencias fueron corregidas y no existe prueba de que otorgantes o terceros sufrieran perjuicios inmediatos, ello no exime al notario de su responsabilidad profesional como funcionario público que reviste de presunción de veracidad y legalidad a los instrumentos que ante él se otorgan. La subsistencia inexcusable de tales deficiencias desde que originalmente le fueron señaladas y hasta la reinspección es patente.*

Además, no sólo se trataba de "errores de cómputo" en la cancelación de sellos, divergencia con el inspector sobre su cancelación o "lamentables imperfecciones" que "aparecen normalmente en las inspecciones notariales", *sino que existen graves faltas de forma y de fondo que no encuentran una válida justificación del notario. Éstas no sólo son graves, sino que se repiten a través de los años durante el período en controversia.*

*Cabe destacar, sin embargo, que dichas deficiencias fueron corregidas una vez este foro lo ordenó, acatando nuestros señalamientos y los del Director. La ausencia de perjuicio patente a otorgantes o terceros y la falta de prueba de apropiación ilegal de los fondos correspondientes a sellos de rentas internas* no agravan lo que es una obra notarial gravemente deficiente. Ello nos permite razonablemente inferir que las deficiencias se *deben a negligencia inexcusable o falta de cuidado en el ejercicio del notariado.*

Dadas las circunstancias antes descritas, el carácter repetitivo y cúmulo de serias omisiones en que incurrió el notario Colón Muñoz, su previo historial, y la ausencia de

justificación válida para algunas deficiencias de carácter grave en su obra notarial, *se decreta la separación permanente de éste del ejercicio de la notaria y la separación por tres (3) meses del ejercicio de la abogacía.*

*Se dictará la correspondiente sentencia.*

El Juez Presidente Señor Andréu García se inhibió. El Juez Asociado Señor Negrón García emitió opinión de conformidad, a la cual se unió el Juez Asociado Señor Hernández Denton. El Juez Asociado Señor Fuster Berlingeri no intervino.

Opinión de conformidad del Juez Asociado Señor Negrón García, a la cual se une el Juez Asociado Señor Hernández Denton.

I

"Las profesiones liberales —dice Savatier— se oponen a las comerciales, a la vez, por su espíritu y por sus modos de actividad. El espíritu de lucro es característica esencial del comercio; y aun cuando el deseo de ganancia se encuentre también en la actividad del profesional liberal, *hay una diferencia espiritual muy grande entre los miembros de profesiones liberales y los comerciantes.* Más aún: el régimen jurídico de las profesiones liberales *tiende a mantener aquella diferencia.*" (Énfasis suplido y en el original.) R. Larraud, *Introducción al estudio del derecho notarial,* 16 Rev. Der. Notarial 37, 146 (1957).

La gravedad, multiplicidad y recurrencia de las cientos de infracciones notariales en las que incurrió durante varios años el Lcdo. Wendell W. Colón Muñoz ameritan su separación *permanente* del ejercicio de la notaría y por el mínimo de tres (3) meses de la profesión de abogado. Sólo así reivindicamos la piedra angular que sirve de ancla a todo el esquema del notariado: el valor de la fe notarial.

A poco reflexionemos, veremos que su práctica notarial fue una de contratación masiva, que en acostumbrada rutina diaria, redujo ese y otros valores importantes a una simple operación mercantilista, y como resultado subordinó importantes presupuestos notariales. Expongamos suscintamente el inventario de infracciones a la Ley Notarial de Puerto Rico.

## II

Entre 1984 y 1986, Colón Muñoz *no canceló ningún* sello de rentas internas en nueve (9) escrituras de hipoteca. Igual conducta observó en 1981 y 1987: en sesenta (60) escrituras *omitió cancelar* sellos por valor de veinticuatro mil seiscientos diez dólares con veinticinco centavos (*$24,610.25*). No hay excusa para ello. Sobre estas escrituras nunca existió divergencia de criterio arancelario con el Inspector de Notarías.

Estamos, pues, ante una flagrante violación, de naturaleza grave y continua. Esas omisiones pusieron en entredicho la validez de todos esos instrumentos. Lo menos que podemos decir es que revela una conducta que "defrauda al erario público". *In re Platón*, 113 D.P.R. 273, 274 (1982); *In re Merino Quiñones*, 115 D.P.R. 812 (1984); *In re Quidgley Viera*, 119 D.P.R. 72 (1987).

No cabe, pues, la defensa que levanta Colón Muñoz, de. que fueron meros "errores de cómputo, cometidos de buena fe" (Comparecencia especial del querellado, pág. 17); menos su pretensión de que las releguemos a la categoría de "infracciones menores".

No podemos ser ingenuos. La prueba es clara y permite inferir que durante seis (6) años —directa e indirectamente— como notario Colón Muñoz aprovechó, desvió y utilizó veinticuatro mil seiscientos diez dólares con veinticinco centavos ($24,610.25) para propósitos diferentes. No cabe su excusa basada en que cuando nos incautamos de su obra

notarial el 27 de enero de 1989 tenía sellos suficientes en su oficina y posteriormente los canceló. Esa contención olvida que su obligación era cancelarlos a medida que otorgaba las escrituras. *Mojica Sandoz v. Bayamón Federal Savs.*, 117 D.P.R. 110 (1986). ¿Cómo ignorar que durante esos seis (6) años no lo hizo? En los documentos notariales —no en escritorios ni en bóvedas de seguridad— es que se "cancelan" los sellos de arancel.

## III

Lo anterior justifica decretar su suspensión *permanente* del ejercicio de la notaría y limitada de la abogacía. *Pero hay más.* Durante el período aludido, el notario Colón Muñoz otorgó cincuenta y una (51) escrituras *nulas* por carecer de firmas de los otorgantes o testigos. *Sucn. Santos v. Registrador*, 108 D.P.R. 831, 837 (1979). Se trata de unas actuaciones graves, que unidas a otras veintinueve (29) escrituras *sin iniciales* demuestran una deficiente y pobre práctica notarial.

Resulta inexcusable que en treinta y tres (33) escrituras Colón Muñoz no aclarara ni indicara el estado civil de los otorgantes, requisito imprescindible. Ese incumplimiento refleja una negligencia crasa impermisible. La experiencia demuestra que es una deficiencia susceptible de generar múltiples controversias en torno a la validez de obligaciones asumidas por personas casadas.

Finalmente, omitir el sello notarial en cincuenta y tres (53) escrituras; no haber firmado siete (7) escrituras; dejar de firmar las *notas de saca* en sesenta y seis (66) escrituras; no firmar ni estampar el sello en las notas de apertura en tres (3) tomos de su protocolo; no encuadernar el protocolo de 1987; mantener seis (6) escrituras con folios y/o espacios en blanco; omitir expresar la cuantía de un (1) pagaré cancelado, y usar guarismos en una escritura, son claros indicadores de un patrón repetitivo de pobre conducta notarial, que cualitativa y cuantitativamente incide

negativamente en la profesionalidad, competencia y diligencia que debe poseer Colón Muñoz como abogado notario.

"[N]i la probidad ni la capacidad darían su rendimiento si se redujesen a metas potencias. Lo que las hace fecundas es el actualizarlas y proyectarlas sobre la realidad práctica, y esto no se consigue más que *con la diligencia para aplicar sus valores*. Diligencia supone aplicación práctica con atención y, además, con medida de las exigencias de la vida, que en *todos* los asuntos, *y singularmente en los de la profesión notarial, son sencillamente las exigencias del tiempo, de la prisa y del vértigo de la época que nos ha tocado existir, y contra el cual es tan inútil luchar como contra los movimientos cósmicos. Esto es tan evidente que huelga entrar sobre el par[ti]cular en mayores esclarecimientos.*" (Énfasis suplido y en el original.) A. Álvarez Robles, *Guión de un ensayo sobre deontología notarial* 7 Anales de la Academia Matritense 5, 53 (1953).

La única ruta decisoria que reivindica los importantes valores profesionales y notariales en juego es decretar su separación *permanente* del ejercicio de la notaría y por el mínimo de tres (3) meses de la abogacía.

